**STATE of Missouri, Respondent,**

v.

**Harry WERBIN, Appellant.**

No. 48141.

Supreme Court of Missouri,

Division No. 1.

March 13, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied April 10, 1961.

Keith Wilson, Jr., Independence, and Walter A. Raymond, Kansas City, for defendant-appellant.

John M. Dalton, Atty. Gen., Donal D. Guffey, Asst. Atty. Gen., Jefferson City for respondent.

HOLLINGSWORTH, Judge.

Upon trial by jury in the Circuit Court of Jackson County, at Independence, defendant was found guilty of manslaughter by the use of instruments upon the body of Janice Easterbrook, a pregnant woman, for the purpose of producing an abortion, in consequence of which said woman died. Section 559.100 RSMo 1949, V.A.M.S.[1] His punishment was assessed at imprisonment in the State Penitentiary for a term of two years. He has appealed from the judgment rendered in accordance with the verdict, contending that the court erred: (1) in denying his motion for discharge for failure of the State to bring his case to trial before the end of the fourth term of court as provided in Sections 545.900, 545.910 and 545.920; (2) in failing to direct a verdict of acquittal or to sustain his motion for new trial for the reason there was no substantial evidence that Janice Easterbrook died as a result of abortion performed upon her by instruments; and (3) in failing to give an instruction "on the defense of accident as a part of the law of the case * * *."

On the day the case was called for trial, October 12, 1959, defendant filed and presented to the court an "Application for Discharge", predicated upon Section 545.-900, which provides that:

"If any person indicted for any offense, and held to answer on bail, shall not be brought to trial before the end of the third term of the court in which the cause is pending which shall be held after such indictment found, he shall be entitled to be discharged, so far as relates to such offense, unless the delay happened on his application, or be occasioned by the want of time to try such cause at such third term."

Due, however, to the fact that in Jackson County there are "more than two regular terms of the court having jurisdiction of

1. All statutory references herein are to RSMo 1949 and the recently published RSMo 1959, unless otherwise indicated.

criminal cases," it is conceded that Section 545.900 is modified by the provisions of Section 545.920, which, insofar as pertinent here, reads:

"In all cities or counties in this state in which there shall be more than two regular terms of the court having jurisdiction of criminal cases, * * * under the circumstances mentioned in section 545.900, the defendant shall not be entitled to be discharged until the end of the fourth term after the indictment was found, * * *."

Defendant relies strongly upon State v. Wear, 145 Mo. 162, 46 S.W. 1099, and State ex rel. Stevens v. Wurdeman, 295 Mo. 566, 246 S.W. 189, in support of his claim of error in the denial of his application. In the Wear case it was stated, 46 S.W. loc. cit. 1105, that although the time limitations fixed by the statute "may be retarded in consequence of various circumstances occurring which the statute mentions as hindering causes," yet, "when requisite time has elapsed, and no showing is made by the state for further delay, the defendant is entitled as of right to a judgment of discharge * * *." In that case, however, the court had under consideration defendant's plea in bar, filed in the trial court prior to trial of the criminal action of which he had been convicted. The plea in bar was based upon dismissal of a prior indictment for the same offense under the provisions of the statutes here invoked by this defendant. In ruling that the plea in bar should have been sustained by the trial court, the supreme court observed that every presumption should be indulged in favor of the validity of the former judgment of dismissal of the first indictment. Accordingly, upon review of the record, each of the first three continuances shown in the record was treated by the court as having been taken at the instance of the State, although the record did not expressly so show, following which the court stated its conclusion, 46 S.W. loc. cit. 1109: "It

thus appears that the case was presumably continued at least three times by the state before the term at which the judgment was rendered; and the record showed affirmatively that it was continued on application of the state at that term, making in all four continuances by the state after indictment found, while only three were necessary in order to entitle defendant to his discharge." We have no such situation in the instant case.

In the Wurdeman case, supra, 246 S.W. loc. cit. 194, the court said of the statute: "The statute is mandatory, and imposes upon the state the duty to bring the defendant to trial 'before the end of the third term of the court' after the term at which the indictment was found. The burden is upon the state to exclude the exceptions. 12 Cyc. 499. The statute makes but two exceptions, and hence there are but two ways in which it can be tolled in the interest of the state. First, if delay is occasioned on application of defendant. The record shows no such application. Secondly, if the delay be occasioned for want of time to try the case. *The record shows no such fact. On the other hand, it is pleaded that there was time to try the case, and the demurrer admits this fact, as it also admits the fact of defendant having made no application for delay."* [2] In the instant case, the pleadings do not admit of any finding that there was time to try the case at any of the terms to which defendant points as one of the "four terms" entitling him to discharge under the statute.

The reason for these statutes is that if the defendant is ready and willing to go to trial he is not to be deprived of his constitutional right to a speedy public trial on account of the laches of the State. On the other hand, of course, if defendant seeks, consents to or connives at delay of the case or if, in addition to the causes mentioned in the statute, there be other equally substantial reasons, for which the State is in no manner responsible, for de-

2. All italics shown herein are supplied.

lay in the trial, such as illness of the judge or inability of the jury to agree, or other nonculpable similar incidents, defendant ordinarily may not successfully invoke the bar of the statute. State v. Nelson, Mo. Sup., 279 S.W. 401, 402–403; State v. Hicks, 353 Mo. 950, 185 S.W.2d 650, 651. In the latter case, the circumstances under which certain statements were made in State ex rel. Stevens v. Wurdeman, supra, were noted and distinguished from facts such as are here presented. See also Osborne v. Owsley, Mo.App., 257 S.W.2d 691, 692–693; Osborne v. Owsley, Mo.App., 259 S.W.2d 129, 131–132.

Defendant's contention must be determined from the record entries made during the terms of court intervening between the return of the indictment and the trial and the reasonable inferences, if any, to be drawn from such entries. There is no other evidence from which the merits of the motion may be otherwise determined. These entries show:

### May Term, 1958

The indictment was returned on September 5, 1958, during the May 1958 Term. On that day defendant was arraigned, pleaded not guilty, was released on bail, and the cause was set for trial on September 8, 1958, it being the first day of the September Term. Concededly, the May Term, being the return term of the indictment, is not to be counted in computing court terms coming within the meaning of the statute.

### September Term, 1958

On October 9, 1958, during the September 1958 Term, the cause at the request of defendant was continued to the November Term. Concededly, the September Term is not to be counted.

### November Term, 1958

On November 10, 1958, during the November 1958 Term, the cause was reset for trial on December 8, 1958. On the latter date (the 23rd day of the November 1958 Term) the record states: "* * * it is ordered by the court that the following causes be transferred to the Criminal Division 'B' * * * and set for trial on the 15th day of December, 1958, among them, to wit:

> C–28803 – State of Missouri vs. Harry Werbin, Manslaughter by Abortion."

There is no evidence in the record that the court acted at the instance of either of the parties in continuing this group of cases. We cannot assume, however, that it acted arbitrarily. To the contrary, we believe it fairly inferable that the continuances (which were ordered near the end of the term) were necessitated by "want of time to try" the cases during the remainder of the November Term.

### December Term, 1958

On March 4, 1959 (the 79th day of the December 1958 Term), the record shows: "* * * on this day it is ordered by the court that the following numbered and entered causes be continued for the term and set for trial on the 9th day of March, 1959, the same being the 1st day of the March (1959) Term and transferred to Division 11-A, among them, to wit:

> C–28803 – State of Missouri vs. Harry Werbin, Manslaughter by Abortion."

Again there is no evidence that the court acted at the instance of either of the parties in continuing this group of cases. We cannot assume, however, that it acted arbitrarily. To the contrary, we believe it fairly inferable that these cases were continued (near the end of the term) for "want of time to try" them during the remainder of the December Term.

### March Term, 1959

On March 9, 1959 (during the March 1959 Term) the cause was reset for April 6, 1959; on April 6, 1959 (during the same term), the cause was reset for April 13,

1959. On April 15, 1959 (the 33rd day of the same term) *defendant filed a motion for continuance,* which the court overruled. *On the same day, defendant sought and was granted a "change of venue"* [3] and the cause was transferred to Criminal Division "B". It thus clearly appears that, in seeking a continuance of the case at the March 1959 Term and in taking a change of venue when the continuance was not granted, defendant is in no position to say (as he nevertheless does) that he is not chargeable with the continuance at the March 1959 Term.

The record also further shows, however, that when the case was transferred to Criminal Division "B", pursuant to the change of venue granted defendant, the State, on April 18, 1959, filed its application for *"change of venue,"* which the presiding judge of that division heard and passed for further consideration, ordering that briefs "in support of motion for change of venue be filed by defendant and plaintiff."

### May Term, 1959

On May 22, 1959, during the May 1959 Term, the Honorable John F. Cook, Judge of Criminal Division "B", made, signed and caused to be entered of record the following order in this case:

"Now, on this 22nd day of May, 1959, this Court overrules the so-called 'Motion and Affidavit for Change of Venue' filed herein; and the Court now on its own motion, under Rule 30.12 of the Supreme Court of the State of Missouri, here and now disqualifies himself and requests the said Honorable Richard C. Jensen, Judge of Division No. 13 of this court, to try said cause and pursuant to Rule 34 of the Rules of the Jackson County Circuit Court hereby transfers said cause to Division No. 13 of the Circuit Court of Jackson County, Missouri, at Independence."

■ Both the application for "change of venue" filed by the State and the order of the judge of Criminal Division "B" can be taken only at their face value, to wit: The State believed that it could not have a fair and impartial trial by reason of interest or prejudice of the judge. The judge, of his own initiative, disqualified himself. Presumably, of course, there was good reason for his doing so. The State cannot be held to have wrongfully delayed trial of the case in seeking in a bona fide and lawful manner a disinterested and unprejudiced judge before whom to try its case.

■ Thereafter, the case was tried in due course in October, 1959. The foregoing record entries, as we view and interpret them, fail to support defendant's contention that the trial court erred in denying defendant's application for discharge.

■ This brings us to the question of the sufficiency of the evidence to support a finding that Janice Easterbrook died as a result of having an abortion performed upon her by the use of instruments. In determining that question, we consider as true the evidence favorable to the State and all favorable inferences to be reasonably drawn therefrom and reject all evidence contrary to and in conflict with the favorable evidence. State v. Hill, Mo.Sup., 328 S.W.2d 656, 659; State v. Archer, Mo. Sup., 328 S.W.2d 661, 665.

Janice, aged 20, lived with her parents; Mr. and .Mrs. Ernest Easterbrook, who were residents of Arcadia, Nebraska. On Wednesday, May 14, 1958, having been advised by physicians in Nebraska that Janice was pregnant and being reluctant to believe the fact, the three of them came to. Kansas City, Missouri, for the purpose of definitely learning whether she was, in fact, pregnant. On Thursday, May 15, 1958, the three of them consulted Dr. William M. Korth, a physician and surgeon of over 33 years' experience. He, at their request,

---

3. The term "change of venue", as used throughout the record, apparently refers to disqualification of the presiding judge of the division in which the case was currently pending and its transfer to another division.

made a physical examination of Janice and had laboratory tests made, which revealed that she was and had been pregnant for approximately three or three and one-half months, and he so advised them. He testified at the trial that he found no indication that anything had occurred to her to cause an artificial abortion, nor that she had taken any medicine for that purpose, nor that any sharp instrument had been used upon her. It was also his opinion that there was nothing about her physical condition that would interfere with the normal progress of pregnancy "up to term and delivery."

On leaving Dr. Korth's office, Mr. and Mrs. Easterbrook and Janice went to the office of defendant (whose name had been furnished to them by a person other than Dr. Korth) for the purpose of having him do whatever he decided was necessary to keep Janice from having a baby. Upon arrival, they found his office closed for the day. On the next morning, Friday, May 16, 1958, they returned, where they were greeted by defendant's receptionist. Defendant had not arrived, but an appointment was made by telephone for him to see them at 11:30 a. m. At that meeting the defendant was advised by the Easterbrooks of the purpose of their visit to his office. Defendant took Janice into his private office where they remained ten or fifteen minutes. Following an examination of her, he told Mr. and Mrs. Easterbrook that his price was $100 for each month of pregnancy and that since she was three months' pregnant his charges would be $300. Asked by the Easterbrooks if the operation was dangerous, defendant said it was not; that people were coming "right along" to him and he was not having any "bad luck" at all; that he could go ahead and in a day or two they could continue a trip through the Ozarks, as they told him they had planned. Mr. Easterbrook thereupon gave $300 to Mrs. Easterbrook, who in turn gave it to Janice and she handed it to defendant. Defendant asked when the Easterbrooks wanted the operation done and Janice said, "Now is as good a time as any." Defend-

ant called Janice into his private office where they remained from ten to fifteen minutes. Upon return to the outer office, Janice did not seem to be "feeling badly", but some drops of blood came down on her shoes. Defendant thereupon took her back into his office and "used cotton or something." He directed Mrs. Easterbrook to go to the drug store below his office and get a package of Kotex, which Mrs. Easterbrook did, at which time she also received "some type of medicine that [defendant] said was for Janice." During that visit in his office, Mrs. Easterbrook inquired of defendant whether Janice should be in a hospital, to which defendant replied, "No. Let's leave the hospitals out of it. I know how to take care of it, and what to do." He also at that time gave the Easterbrooks a card with his name on it and on which he wrote the name of the U-Smile Motel on Highway 40. Janice asked defendant, "Can't we start this and let it go normally?" Defendant replied, "No," that they should return to his office Saturday morning, May 17, 1958. On that morning, the three of them returned as directed. Janice went into defendant's private office where she remained at least fifteen or more minutes. When she came out of his office, she was crying quite hard and said, "He hurt me."

The Easterbrooks then drove around for awhile and returned to the U-Smile Motel. Late in the afternoon of Saturday, May 17, Janice began to vomit "real bad." Mrs. Easterbrook called the defendant. He did not think it necessary for him to come to the motel but at Mrs. Easterbrook's insistence did so. Later that day, defendant made more trips to the motel and ultimately spent the greater part of Saturday night with them. Janice was very sick all night, suffering much pain. Mrs. Easterbrook thought she ought to be in a hospital. Defendant said it was not necessary, that those things were common. During this time (Saturday evening), defendant worked on Janice with a curved instrument about ten inches long. He removed tissue from inside her vagina.

On Sunday morning, May 18, defendant was again called, but before he arrived, Janice, who had been lying on the bed, went into the toilet and passed a fetus. It was about six inches long and considerably mutilated.

About 11:00 o'clock Sunday morning, defendant called Dr. Richard P. Mucie to assist him. At that time, according to the Easterbrooks, Janice was "very, very low," her face was blue and she was breathing very fast. Shortly before her death, which ensued as the Easterbrooks believed at the motel, defendant and Dr. Mucie conferred outside the hearing of the Easterbrooks. Following that conversation, Dr. Mucie picked Janice up and carried her to defendant's car and defendant told the Easterbrooks that they were going to take her to the Independence Hospital and that the Easterbrooks should follow, which they attempted to do. The defendant went six miles east from the U-Smile Motel, turned around, and the Easterbrooks lost him in the traffic. Defendant actually left Janice's body at the General Hospital. Concededly, she was dead upon arrival there.

Dr. Hugh H. Owens, the Jackson County coroner, a medical physician, whose qualifications were admitted at the trial, did an autopsy of Janice's body on Sunday afternoon, May 18, and especially of her female organs. He found an enlargement of the uterus and dilation of the cervix. There was some placental tissue adhering to the wall of the uterus, which indicated a recent pregnancy and abortion. It was his opinion, based on his post-mortem examination, that her death was due to hemorrhage following an abortion. The finding of the placental tissue indicated that there had been a fetus in the uterus. His examination also revealed a small hole or small rupture of the posterior wall of the uterus, but there was no peritonitus of the uterus, and it was the doctor's opinion that the hole or rupture was not the cause of her death. A pregnant uterus is soft and it is easy to run an instrument through it. Dr. Owens further testified that a curettement is an operation performed to remove placental tissue remaining after the passage of a fetus; and that a curettement is painful and is not ordinarily done without hospitalization and use of an anesthetic.

The defendant did not testify. The following witnesses, called as witnesses in his behalf, testified:

Joseph L. Connors, a deputy coroner of Jackson County, not shown to be a doctor, testified without objection that he was called to the receiving ward at General Hospital No. 1 in Kansas City at 3:10 p. m., where he met defendant who told him that he had brought a young lady into the hospital whom he had been called to treat at U-Smile Motel for hemorrhage; and that defendant said he had used various medicines to stop the hemorrhage and had brought her to the hospital.

Dr. Richard P. Mucie, an osteopathic physician, testified that defendant called him in consultation at about 11:00 a. m., on Sunday, May 18. He also testified, without objection, that defendant informed him that he had a case out at U-Smile Motel of "self-induced abortion and he wanted me to come out there to assist him on the case, which I did." He also testified, without objection, that defendant advised him that the patient had been to various doctors and she came to his office in "a state of complete hemorrhage"; and that defendant had performed a "curettement" on the girl, which is an operation for the purpose of removing "aftermath still left in the uterus." He further testified that Janice had "a cyanotic appearance, a black and blue appearance in the face, which * * * gave me the opinion that this girl had died from an emboline"; and that an "emboline" could be a clot of blood circulating in the blood stream and lodged in the heart or lungs, or it could be an air bubble, which would be the same thing. The witness gave Janice an injection to stimulate her circulation and he and defendant decided to take her to the hospital, the closest one being the Independence Sanitarium. After placing

Janice in defendant's car, the witness followed defendant. The witness gave it as his opinion that Janice died of an embolism, which could have been caused from hemorrhage.

Dr. Mucie further testified that during the trip to the hospital, he and defendant conferred and decided that probably the Independence Sanitarium (not being favorable to osteopathic physicians) would not admit the girl, so they started to Dr. Nigro's Hospital. Defendant was driving fast and their cars became separated. The witness, on calling Dr. Nigro's Hospital, learned that Janice had not been admitted there.

Norma L. Anderson testified: She is a receptionist in defendant's office, answers the telephone, makes appointments and cleans up the office. On the morning of May 16, 1958, the Easterbrooks came to the defendant's office, seeking an appointment with him. Defendant was not then at his office, but the witness called him over the telephone and Mr. Easterbrook talked to him. At that time Janice came out of the reception room and asked to use the witness' rest room. Janice remained in the rest room eight or ten minutes, re-appeared, asked witness if she had a mop she could use. The witness asked, "For what?" Janice showed her some blood on top of the toilet seat, which she wanted to clean off. The witness "cleaned up the mess." When the defendant arrived, he took Janice back to the examination room on two occasions, each of which lasted about five minutes. Janice was not crying or showing evidence of pain at any time. The Easterbrooks came back around 11:30 the next morning. At that time the doctor took Janice into his office where she remained between five and six minutes.

Dr. Albert E. Upsher, a medical doctor, specializing in pathology, testified in behalf of defendant that he had examined the autopsy report of Dr. H. H. Owens, the Jackson County coroner, which, as he testified, he believed to be inadequate for the purpose of determining the cause of her death. He further testified that a properly performed induced abortion with a team working would "probably require forty minutes on the average, and that would be a very nervous estimate."

■ The mere recital of the evidence shows that there was substantial evidence sufficient to support a finding that the defendant, with intent to produce a felonious abortion upon Janice, did use upon her an instrument to produce such abortion, from which said acts of defendant the death of Janice was occasioned. Section 559.100.

Defendant further insists that the "facts and circumstances relied upon by the State to establish defendant's guilt are inconsistent with each other and with the hypothesis of defendant's guilt and do not point so clearly and satisfactorily to defendant's guilt as to exclude every reasonable hypothesis of his innocence." We have hereinabove undertaken to set forth the evidence material to determination of defendant's guilt. A careful review of it shows no substantial inconsistency in the facts adduced in behalf of the State. Of course, some of the State's evidence adduced is in conflict with some of defendant's evidence, but the peculiar function of the jury is to resolve those conflicts and it did so, favorably to the State. The evidence adduced in behalf of the State is consistent with the jury's verdict and inconsistent with any reasonable theory of defendant's innocence. The contention is without merit.

Defendant's final contention is that it was the duty of the court "to give an instruction on the defense of accident as a part of the law of the case when the testimony favorable to defendant tended to prove death occurred accidentally while defendant was caring for a patient already in process of aborting when she came to him for treatment and when he was lawfully caring for her by lawful means with usual and ordinary caution and without unlawful intent within the meaning of Section 559.050, RSMo 1949." Section 559.-050, supra, defines excusable homicide.

It is true that the testimony of defendant's receptionist was to the effect that Janice was undergoing a vaginal hemorrhage in defendant's office prior to any examination of her by defendant. It may be doubted whether that testimony, standing alone, would warrant a finding that she was in process of aborting or that the abortion which followed two days thereafter occurred or would have occurred without intervention on the part of defendant. For the purpose of this opinion, however, we will assume that it would, if believed, warrant such a finding. Neither is there a scintilla of evidence that defendant was "caring" for Janice as "a patient already in process of aborting when she came to him for treatment" other than the incompetent self-serving statements made by defendant to Dr. Mucie when Janice's death was impending and to the deputy coroner when she, then dead, was brought by him to the General Hospital. Inasmuch, however, as these statements were admitted in evidence without objection, we will assume, without deciding, that they constitute substantial evidence of the fact.

 But this "evidence", as we view it, is beside the point. The admitted facts are that Janice, admittedly pregnant, suffered an abortion and her death ensued. The issue was whether (1) the defendant committed the abortion in the manner charged and shown by the evidence in behalf of. the State, and (2) whether her death was thereby occasioned by defendant's criminal acts in committing said abortion. If defendant did commit the abortion, as charged and shown by the State's evidence, and Janice's death was *"thereby occasioned"*, defendant is guilty, irrespective of whether her death was accidentally caused during the course of performing the abortion. Section 559.100. See also State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, 343 [15–17]. The transcript shows that the jury was fully instructed upon the necessity of finding beyond a reasonable doubt the criminal agency of defendant in (1) the commission of

the abortion and (2) that death ensued in consequence thereof. Moreover, defendant requested no instruction whatever upon the theory of accident or any other phase of the merits. Clearly, the issues and evidence in this case do not require instruction on "accident" under S.Ct. Rule 26.02(6), V.A. M.R. requiring the trial court to instruct upon all questions of law necessary for the guidance of the jury in returning their verdict. The trial court fully complied with that rule in other instructions given the jury.

The judgment is affirmed.

All concur.