STATE of Missouri, Respondent,

v.

William T. MORRISON, Appellant.

No. WD 73684.

Missouri Court of Appeals,
Western District.

April 24, 2012.

Ellen H. Flottman, District Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division Two: MARK D. PFEIFFER, Presiding Judge, and KAREN KING MITCHELL and GARY D. WITT, Judges.

KAREN KING MITCHELL, Judge.

Following a jury trial in Lafayette County, appellant, William Morrison, was convicted, as a persistent felony offender, of stealing by deceit. He was sentenced to fifteen years' imprisonment, to run consecutively with any existing sentences. Morrison raises three points on appeal: (1) the court erred in failing to dismiss the charges pursuant to the Interstate Agreement on Detainers Act; (2) the court erred in failing to dismiss the charges pursuant to section 545.890[1] (the terms of court statute); and (3) the court erred in failing to declare a mistrial following the prosecutor's reference to Morrison's prior conviction in closing argument. Finding no error of law, we affirm.

## Factual Background[2]

In the fall of 2003, Bart Cooper was the owner of a bail bonds company, and he became familiar with Morrison because Morrison would occasionally act as a co-signer or an indemnitor on bonds for people wanting to get out of jail. They also attended a few real estate auctions together. Morrison represented to Cooper that he had knowledge of the real estate business, and Cooper occasionally worked with Morrison in attempts to purchase real estate.

Cooper and his wife owned a home in Bates City, Missouri, that they wanted to sell. In January of 2004, the Coopers moved out of the home to a new home in Lee's Summit. Sometime in February of 2004, the Coopers and Morrison entered into an agreement whereby Morrison would live in the Bates City residence and try to sell it for the Coopers. They met with an attorney to discuss the arrange-

ment, but no paperwork was ever drawn up memorializing the agreement.

At some point, Morrison indicated that he had found a buyer from California, but he insisted that the Coopers sign the house over to Morrison so that he could complete the transaction. The Coopers refused to do so, becoming leery of their business dealings with Morrison. On April 22, 2004, the Coopers affirmatively advised Morrison to vacate the property and requested that he return the keys to the home.

In July of 2004, Mr. Cooper went by the Bates City residence and found bills in the name of both Morrison and Anita Sheninger, as well as some of Morrison's possessions, in the home. The Coopers turned off the utilities and instituted eviction proceedings.

In August of 2004, Michael Stewart and his wife owned a home in Oak Grove, Missouri, but wanted to move. Stewart's brother-in-law lived near the Coopers' home in Bates City and advised Stewart about a house for sale by owner around the corner from him. The Stewarts made an appointment and went to view the home on August 15th; it was at that time that they met Morrison, who was attempting to sell the home. The Stewarts were interested and viewed the home again a couple of days later. After the second viewing, the Stewarts made an appointment with Morrison at their residence in Oak Grove to sign a contract. The contract contained a provision indicating that the sale .was contingent upon the Stewarts selling their Oak Grove home.

When Morrison arrived at the Stewarts' home, he was accompanied by Anita Shen-

---

1. Statutory citations are to RSMo 2000, as updated through the 2011 cumulative supplement.

2. "We view the facts in the light most favorable to the jury's verdict." *State v. Fincher*, 359 S.W.3d 549, 551 n. 1 (Mo.App. W.D. 2012).

inger and her daughter. Morrison indicated that Sheninger was his secretary and that she was also looking for a house in the price range of the Stewarts' home. Sheninger agreed to purchase the Stewarts' home for $150,000, and the Stewarts agreed to purchase the Coopers' home for $239,000;[3] they then signed contracts to that effect. When entering the contracts, the parties agreed to exchange earnest money checks in the amount of two percent of the purchase price of the respective homes, and then cash the checks, turn them into cashier's checks, and take them to the title company suggested by Morrison. Accordingly, Sheninger wrote a check in the amount of $3,000 to the Stewarts, and the Stewarts wrote a check in the amount of $4,780 to Morrison.

The next morning, Mrs. Stewart received a phone call from Sheninger after which Mrs. Stewart agreed not to cash Sheninger's check, so long as Morrison did not cash Mrs. Stewart's check. Following the conversation, Mrs. Stewart immediately contacted her bank to put a hold on Morrison's check only to discover that it had already been cashed by Morrison. Mrs. Stewart reacted by attempting to cash Sheninger's check, but was unable to do so due to insufficient funds in the account. Over the next month, Mrs. Stewart attempted to cash Sheninger's check seven times to no avail.

The same day that she first attempted to cash Sheninger's check, Mrs. Stewart contacted Morrison and demanded the return of her money until Sheninger figured out her financing for the home. Morrison advised that he was not in a financial

situation at that time (the same day he cashed the check) to return the money and was "extremely rude" to Mrs. Stewart. On August 31, the Stewarts discovered that Morrison's name was not on the deed and that he did not own the home. The Stewarts repeatedly tried to contact both Morrison and Sheninger, but were not successful. They eventually reported Morrison and Sheninger to the local sheriff's department.

On January 12, 2005, the Lafayette County prosecuting attorney filed a criminal complaint against Morrison, and a warrant issued for his arrest. It appears that sometime around August 17, 2005, Morrison was picked up in Escambia County, Florida, on Lafayette County's warrant, and Escambia County then filed a fugitive complaint against Morrison in order to institute extradition proceedings for Lafayette County. Lafayette County obtained three separate Governor's Warrants for purposes of extraditing Morrison back to Missouri, but none of those efforts were successful.[4]

Sometime around the end of March or beginning of April 2007, Morris was incarcerated in Florida on local charges.[5] On May 31, 2007, Morrison was indicted in Lafayette County for stealing more than $500 based on his conduct regarding the Stewarts' check, and a warrant on the indictment issued for his arrest.

On December 7, 2009, Morrison filed a pro se "Motion to Notify Court for Final Disposition of Detainer." This motion was not served on the Lafayette County prosecutor. Morrison filed a second pro se

---

3. The Stewarts were unaware at the time they entered the contract that the Coopers were the true owners of the Bates City home; they believed Morrison was the owner.

4. Morrison indicated that he had "fought extradition," and he was never served with a Governor's Warrant.

5. Although Morrison was picked up on the Missouri warrant in 2005, it does not appear that he was continuously incarcerated in Florida from 2005 until he was incarcerated on Florida charges in 2007.

motion for disposition of detainers on January 4, 2010. Morrison again failed to serve the Lafayette County prosecutor. On January 29, 2010, Morrison filed a third pro se motion for disposition of detainers; this time, his motion was served on the Lafayette County prosecutor. In response to this motion, the Lafayette County prosecutor contacted the authorities in Florida and was informed that there was no detainer in place on Morrison. Accordingly, the prosecutor filed a detainer on Morrison with the Florida Department of Corrections sometime in February 2010. On March 12, 2010, Morrison filed a fourth pro se motion for disposition of detainers.

Beginning April 5, 2010, proceedings under the Interstate Agreement on Detainers Act were commenced. On May 4, 2010, the warrant on Morrison's indictment was served on Morrison. On June 7, 2010, the court scheduled Morrison's trial to begin on June 23, 2010.

On June 15, 2010, Morrison filed a motion to dismiss based upon alleged violations of the Interstate Agreement on Detainers ("IAD") Act and his speedy trial rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Morrison's argument about the IAD violation was based upon the allegation that the 180–day period began to run when he filed his December 7, 2009, motion for disposition of detainers. The court held a hearing on Morrison's dismissal motion on June 16, 2010, and at that time, Morrison waived all IAD requests except the December 7, 2009, request and sought a continuance of the June 23, 2010, trial date for purposes of performing necessary investigation. The court granted Morrison's continuance request until November 3, 2010, but reserved ruling on the motion to dismiss. On October 22, 2010, Morrison requested a second continuance of the trial date, which was granted until February 3, 2011.

At trial, Morrison testified on his own behalf, indicating that he had an agreement with the Coopers, wherein he would stay at the residence and attempt to sell the property, and if he was successful, he would be allowed to keep any profit made over the Coopers' desired price of $205,000. Morrison testified that he was not residing at the Coopers' home, but he had left a few personal belongings there. He also testified that the Coopers never told him that he could not sell their house, and the only reason the contract with the Stewarts fell through was because the Coopers refused to cooperate based upon a disagreement as to the contract price and Morrison's take of the profit. Regarding Sheninger's bounced check for the earnest money, Morrison testified that the Stewarts knew Sheninger's purchase was premised on financing from a lender, and that they would have to take up the insufficient funds with the lender, but he was proceeding with his end by cashing their check and contacting the title company.

Mr. Cooper testified in rebuttal that he ended the agreement with Morrison to sell the home after the first contract fell through because he no longer trusted Morrison. He also testified that he never knew about the contract Morrison had negotiated with the Stewarts until sometime in September 2004. Mrs. Stewart also testified in rebuttal, and she indicated that Morrison never said anything to her about Sheninger requiring special financing.

The jury found Morrison guilty of stealing by deceit. On the day of sentencing, Morrison filed a second motion to dismiss, this time invoking section 545.890 and arguing that because he was not brought to trial within the requisite number of terms of court, dismissal was required. The court took the motion to dismiss under advisement and sentenced Morrison to fif-

teen years' imprisonment. Two days later, the court denied the motion to dismiss.

## Analysis

Morrison raises three points on appeal. First, he claims that the trial court erred in denying his pre-trial motion to dismiss based upon the Interstate Agreement on Detainers Act, § 217.490 *et seq.*, because he was not tried within 180 days of his December 7, 2009, request for disposition of detainers. Second, he claims that the trial court erred in denying his post-trial motion to dismiss based upon the terms of court statute, § 545.890, because he was not tried within three terms of court as required by the statute. Morrison's final claim on appeal is that the trial court erred in failing to declare a mistrial, *sua sponte*, based upon the prosecutor's reference to Morrison's prior conviction during closing argument.

### A. Morrison was not entitled to dismissal based upon the IAD.

■ "The IAD is a congressionally[ ] sanctioned interstate agreement that permits a prisoner in one state to seek disposition of criminal charges filed against him by [a] second state." *State v. Lybarger,* 165 S.W.3d 180, 184 (Mo.App. W.D.2005). "The purpose of the IAD, as set forth in Article I, is to encourage the expeditious and orderly disposition of charges outstanding against a prisoner and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." *State v. Vinson,* 182 S.W.3d 709, 711 (Mo.App. E.D. 2006). "A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." *Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985).

"We review *de novo* the trial court's application of the law in refusing to dismiss the indictments against Appellant under the IAD." *State v. Davis,* 210 S.W.3d 229, 233 (Mo.App. W.D.2006). But "[t]o the extent the application of law is based on the evidence presented, we view the facts in a light most favorable to the judgment, giving deference to the trial court's factual findings and credibility determinations." *Lybarger,* 165 S.W.3d at 184.

■ A person seeking the protections of the IAD must establish the following: (1) the person is incarcerated in one state (sending state); (2) there are untried charges against the person in a second state (receiving state); (3) the receiving state has lodged a detainer against the person on the basis of the untried charges; and (4) the person has notified both the prosecuting attorney and the appropriate court of the prosecuting attorney's jurisdiction in the receiving state of his current place of imprisonment in the sending state and his request for final disposition of the untried charges. § 217.490, Art. III, § 1. If these four criteria are met, then the receiving state must bring the person to trial on the untried charges within 180 days of the notification and request for disposition, or the charges must be dismissed. *Id.* at § 4. To establish a violation of the IAD, the person seeking its protection bears the burden of proving that the four criteria were satisfied. *Lybarger,* 165 S.W.3d at 185. "Once a prisoner has gone forward with evidence showing that she has complied with all the specific requirements of the Interstate Agreement on Detainers, then the burden shifts to the State to produce evidence on the record that there was good cause to delay trial beyond 180 days." *State ex rel. Hammett v. McKenzie,* 596 S.W.2d 53, 59 (Mo.App. E.D.1980).

Morrison's first point on appeal argues that the trial court erred in overruling his

motion to dismiss in that the State violated the IAD because it did not bring him to trial within 180 days of his December 7, 2009, request for disposition. We find that Morrison failed to meet his burden of establishing compliance with the specific requirements of the IAD; thus, his claim is denied.

*1. There was no detainer, de facto or otherwise, at the time of Morrison's request for disposition.*

■ The first flaw in Morrison's claim is that he failed to prove that a detainer was in existence as of the December 7, 2009, request for disposition. The prosecutor indicated that she contacted Florida in the early part of 2010, after receiving Morrison's January 29, 2010, request for disposition, and she was advised that there was no outstanding detainer on Morrison. After learning this information, the prosecutor lodged a detainer on Morrison based on his untried Lafayette County charges sometime in February of 2010.

■ "[F]or an inmate to invoke the provisions of the [IAD], a detainer must have been lodged against him." *State v. Pugh,* 357 S.W.3d 310, 313 (Mo.App. W.D.2012).[6] "The Agreement has required the filing of a detainer to activate its provisions since its inception." *Carson v. State,* 997 S.W.2d 92, 97 (Mo.App. S.D.1999).

Morrison argues that "[t]here was a document titled a detainer/fugitive warrant sent by Lafayette County to Escambia County, Florida, on August 17, 2005," and that this "warrant should act as a *de facto* detainer." There are several flaws with Morrison's argument. First, the document to which he refers does not indicate that it was sent to Escambia County by Lafayette County. Rather, it appears to be just the opposite. The document is on the Escambia County Sheriff's letterhead and appears to be a notification from Escambia County to Lafayette County that Morrison had been detained by the Escambia County Sheriff's Department on his outstanding warrant from Lafayette County. This notice was necessary for Lafayette County to institute extradition proceedings if it so chose.

Second, there is nothing about this document, apart from the word "detainer" appearing in it, that indicates that it was, in fact, a detainer. As noted above, it was not issued by Lafayette County, and there is no indication within it that Lafayette County sought for Escambia County to either hold Morrison or advise Lafayette County when Morrison's release was imminent. Thus, it cannot constitute a detainer as defined in *Carchman.*

Third, the Lafayette County warrant for Morrison's arrest does not, itself, constitute a *de facto* detainer. *See Pugh,* 357 S.W.3d at 314; *and Greene v. State,* 332 S.W.3d 239, 245–46 (Mo.App. W.D.2010) (both holding that notice of a warrant, by itself, does not constitute a detainer).

*2. Morrison's December 7, 2009, request for disposition did not substantially comply with the requirements of the IAD.*

■ The second flaw in Morrison's argument is that his December 7, 2009, request for disposition was not served on the prosecutor. Even if a detainer had been placed as of December 7, 2009, Morrison's request would not have triggered the commencement of the 180–day period because his request was not served on the prosecutor, as is required by the IAD. To substantially comply with the require-

---

**6.** *Pugh* addressed a claim under Missouri's Uniform Mandatory Disposition of Detainers Law (UMDDL). Because the UMDDL and the IAD are *in pari materia,* "they are construed in harmony with each other, and the principles of one may be applied to the other." *Carson v. State,* 997 S.W.2d 92, 96 (Mo. App. S.D.1999).

ments of the IAD, the defendant, at a minimum, must "submit a request addressed to the circuit court and the prosecuting attorney." *Greene*, 332 S.W.3d at 245. "The 180–day time period does not begin to run until both the prosecuting attorney and the circuit court received a defendant's request for disposition." *Id.* at 245–46. "The burden of proving whether the prosecuting attorney receives the request is on the defendant." *Id.* at 246.

Here, the motion itself bore no certificate of service. The prosecutor indicated that the first request for disposition that she received was the January 29, 2010, request, and that she never received the December 7, 2009, request. Morrison introduced no evidence supporting a contrary conclusion. Thus, he failed to carry his burden of proving substantial compliance with the requirements of the IAD and cannot now seek its protections.

### 3. There was no violation of the IAD.

■ The earliest possible date for the 180–day period to commence in Morrison's case was on March 12, 2010. As of that date, Morrison was incarcerated in Florida, had pending charges in Lafayette County, had a detainer placed on him by Lafayette County, and had notified both the circuit court and the prosecutor of his request to dispose of the untried charges.[7] One hundred eighty days from March 12, 2010, would have been September 8, 2010. While Morrison was not actually tried until February 3, 2011, that delay was based solely upon two continuances requested by Morrison. "Any delay of a prisoner's trial which results from his affirmative action or agreement is not to be included in the period of limitation." *State v. Overton*, 261 S.W.3d 654, 660 (Mo.App. S.D.2008). This includes "delay[s] result[ing] from a continuance requested by defendant." *Id.*

Morrison's original trial was scheduled for June 23, 2010, a date well within the 180–day period. Thus, he has failed to establish a violation of the IAD.

Point I is denied.

### B. Morrison was not entitled to dismissal based upon section 545.890.

■ Morrison's second point on appeal argues that the trial court erred in overruling his post-trial motion to dismiss in that the State violated section 545.890, the terms of court statute. That statute provides that

> [i]f any person indicted for any offense, and committed to prison, shall not be brought to trial before the end of the second term of the court having jurisdiction of the offense which shall be held after such indictment found, he shall be entitled to be discharged, so far as relates to the offense for which he was committed, unless the delay shall happen on the application of the prisoner, or shall be occasioned by the want of time to try the cause at such second term.

§ 545.890.

Section 478.205 states that "[t]he circuit court of each county … shall be considered as being in continual session, and it shall not be necessary for a term or special term of any such court to be convened or held for such court or the judges thereof to conduct the business of the court with respect to any case or matter before the court." The statute further provides, "[t]o the extent that a term of a circuit court may be required or specified by any provision of law, … each circuit court for convenience may provide by local court rule" the number of terms per year and the dates on which such terms are to commence. *Id.*

---

7. Morrison waived any claim related to the March 12, 2010, request for disposition when he sought to preserve his claim based solely on the December 7, 2009, request.

Lafayette County is within the Fifteenth Judicial Circuit, and local rules provide that the circuit court of Lafayette County

shall be in continual session as provided by Section 478.205, RSMo[, and t]o the extent that a term of circuit court may be required ... by any provisions of law, the 'terms' of court shall be considered as commencing ... on the first Monday in the months of March, July, and November.

15th CIR. R. 2.2(a). Because Lafayette County has three "terms" of court, section 545.920 supplements section 545.890 by providing that

[i]n all cities or counties in this state in which there shall be more than two regular terms of the court having jurisdiction of criminal cases, the defendant shall not be entitled to be discharged for the reasons and under the circumstances mentioned in section 545.890 until the end of the third term after the indictment was found.

§ 545.920.

According to Morrison, because he was indicted on May 31, 2007, section 545.920 required that he be tried no later than July 7, 2008 (the last day of the third term following indictment). Morrison argues that since he was not tried until February 3, 2011, he was entitled to discharge. We disagree.

Our analysis necessarily begins by looking at the date Morrison was indicted May 31, 2007. That same day, a warrant for Morrison's arrest was issued on the indictment, but it was not served until May 4, 2010. The record shows that Morrison was incarcerated in the Florida Department of Corrections beginning sometime in

early 2007. The record also shows, however, that the Lafayette County Prosecutor was unaware of Morrison's Florida incarceration until early February of 2010.[8] While the record indicates that Lafayette County apparently believed Morrison was in Florida sometime in 2005 (based upon a series of Governor's Warrants issued to the Florida authorities), the record also indicates that Lafayette County's efforts to extradite Morrison were unsuccessful. And there was no evidence to indicate that Lafayette County knew of Morrison's whereabouts in the time period between the indictment and Morrison's January 29, 2010, request for disposition of detainers. As soon as Lafayette County became aware of Morrison's location in the Florida Department of Corrections, based upon his detainer disposition request, Lafayette County took the necessary steps to have Morrison returned to Missouri for trial. According to the IAD forms provided by Morrison, it seems that he was returned to Missouri sometime in April of 2010.

Section 545.790 applies to this situation. That statute provides, in pertinent part, that "[i]f any person indicted for a criminal offense abscond or flee from justice, *or cannot be found to be served with process,* ... the cause may be continued from term to term, without issuing process on the indictment; and such process may be issued at any time on the application of the prosecuting attorney." For this statute to have any appreciable effect, it must be read to mean that the terms of court within which a defendant must be tried under section 545.920 do not commence until the defendant is served with process on the indictment after being located. *See State*

---

**8.** If there was evidence that the State knew of Morrison's whereabouts after the indictment but before February 2010, it was Morrison's burden to establish that fact, which he failed to do. *See State v. Maynard,* 714 S.W.2d 552, 554 (Mo.App. W.D.1986) ("If a defendant seeks to obtain the remedy of dismissal under [a speedy trial] statute ..., he has the burden of showing not only the passage of [the requisite time] but the further burden of showing that the failure to bring him to trial within that time was 'occasioned' by the state.").

*v. Paxton,* 535 S.W.2d 558, 559 (Mo.App. 1976) ("In any event, such three-term period is commenced only when charges are filed *and* the defendant is arrested or committed.") (emphasis added).

Here, Morrison was served with process on May 4, 2010. This would have been during the March 2010 term of the court. The trial began on February 3, 2011, which would have been within the November 2010 term of the court. Thus, Morrison's trial occurred within three terms of court from the time he was served with the warrant on the indictment.[9] Therefore, there was no violation of section 545.920, and the trial court committed no error in overruling Morrison's motion to dismiss.[10]

■ In any event, by its express terms, section 545.890 is inapplicable where "the delay shall happen on application of the prisoner." Here, Morrison was not in the state for trial until sometime in May of 2010 due to his incarceration in Florida on local charges. His trial was set for June 23, 2010, but was continued twice on his application.

"The reason for these statutes is that if the defendant is ready and willing to go to trial he is not to be deprived of his constitutional right to a speedy public trial on account of the laches of the State." *State v. Werbin,* 345 S.W.2d 103, 105 (Mo.1961). "On the other hand, of course, if defendant seeks, consents to or connives at delay of the case . . ., defendant ordinarily may not

successfully invoke the bar of the statute." *Id.* at 105–06.

Morrison has pointed to no evidence of laches on the part of the State in bringing him to trial. On the contrary, the prosecutor advised the court that she was unaware of Morrison's incarceration in Florida until late January or early February of 2010. She then filed a detainer with the Florida Department of Corrections in February of 2010. The record indicates (by the date of service on the warrant) that Morrison was not returned to Missouri until May of 2010. His trial was scheduled less than two months after his return. Although the trial did not actually take place until approximately eight months after his return, this delay was entirely attributable to Morrison's two continuance requests. Consequently, he was not entitled to dismissal pursuant to section 545.890.

Point II is denied.

## C. The prosecutor was permitted to use Morrison's prior conviction to argue his lack of credibility as a witness.

■ Morrison's final point argues that the trial court committed plain error in failing to *sua sponte* declare a mistrial following what he deems to be an improper argument by the prosecutor during closing.

■ " 'Statements made in closing argument rarely constitute plain error.' "

---

**9.** It is unclear whether the March 2010 term would factor into the calculation. Normally, "[t]he term at which the information was filed is not included in the computation." *State v. Roach,* 480 S.W.2d 841, 842 (Mo.1972). We have found no cases indicating whether the term in which a defendant is served pursuant to section 545.790 is likewise excluded.

**10.** The State argues that Morrison's motion was untimely. It may very well be that Morrison waived this claim by failing to assert the protection of the statute before trial. Indeed,

case law indicates that a defendant is entitled to discharge under section 545.890 only if he properly raises the claim; otherwise, it is waived. *State v. Barrett,* 406 S.W.2d 602, 604 (Mo.1966). What the cases do not discuss, however, is how one properly asserts the claim. Here, Morrison repeatedly asserted an interest in a speedy trial before trial, but he failed to specifically invoke the protection of section 545.890 until after trial. Because we find that Morrison's claim otherwise lacks merit, it is unnecessary to resolve this question.

*State v. Baumruk,* 280 S.W.3d 600, 618 (Mo. banc 2009) (quoting *State v. Lloyd,* 205 S.W.3d 893, 908 (Mo.App. S.D.2006)). Without an objection, the circuit court's "options are narrowed to uninvited interference with summation, which may itself constitute error." *Id.* "Under plain error review, a conviction will be reversed for improper closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice." *State v. Deck,* 303 S.W.3d 527, 541 (Mo. banc 2010). The defendant bears the "burden of proving that the allegedly improper argument had a decisive effect." *State v. Hamilton,* 328 S.W.3d 738, 744 (Mo.App. W.D.2010). "An argument has a decisive effect when it is reasonably probable that, absent the argument, the verdict would have been different." *Baumruk,* 280 S.W.3d at 618.

The argument about which Morrison complains is as follows: "He's serving time for racketeering. This is not an honest man. This, right here, is a con man."

During Morrison's testimony, he acknowledged that he was currently incarcerated in the Florida Department of Corrections for racketeering. Section 491.050 provides, in pertinent part, that "[a]ny person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a ... criminal case...." "Under section 491.050, when a defendant elects to testify in his own defense, the State has the absolute right to introduce prior convictions of the defendant for the purpose of impeachment." *State v. Gregory,* 42 S.W.3d 766, 768 (Mo.App. W.D.2001); *see* § 546.260.

The prosecutor's argument here is best read as an attack on Morrison's credibility as a witness.[11] In a similar case, the Southern District found no plain error in a closing argument where the prosecutor argued:

> [I]n determining [Defendant's] credibility, you can also remember criminal history ... you can remember he's a counterfeiter, he's a safecracker, he's a thief, he's a burglar, he's a forger. And they told you that he had a little trouble when he was young. He had a twenty-five year criminal history. Oh, I forgot, escape—twice. You can think about those things in determining his credibility. *In the art of good counterfeiting— you can't pass if people don't trust you.* And when he testified ... [h]e was likeable. You wanted to trust him. A lot of people have over the years.

*Lloyd,* 205 S.W.3d at 908. The Southern District determined that "the prosecutor was simply urging the jury to consider Defendant's extensive criminal background in deciding whether to believe his testimony." *Id.* We believe the same is true in Morrison's case. Consequently, we find no error, plain or otherwise.

Point III is denied.

## Conclusion

The trial court committed no error, plain or otherwise, in overruling Morrison's motions to dismiss. There was also no impropriety in the prosecutor's closing argument; thus, the court was under no duty to *sua sponte* declare a mistrial. Morrison's convictions and sentences are affirmed.

---

11. Though we need not decide whether the prosecutor could have permissibly used Morrison's prior conviction to argue his guilt of the charged crime, we note that the State is generally entitled to introduce evidence of prior convictions for similar offenses in cases of stealing by deceit in order to prove the defendant's intent to deceive in the charged case. *State v. Thurman,* 692 S.W.2d 317, 319 (Mo.App. E.D.1985).

MARK D. PFEIFFER, Presiding Judge, and GARY D. WITT, Judge, concur.