**STATE of Missouri, Respondent,**

v.

**Charles PUGH, Appellant.**

**No. WD 73546.**

Missouri Court of Appeals,
Western District.

Jan. 31, 2012.

Emmett D. Queener, Columbia, MO, for appellant.

Christopher D. Wilson, Fulton, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, JAMES M. SMART and ALOK AHUJA, Judges.

LISA WHITE HARDWICK, Chief Judge.

A jury convicted Charles Pugh of trespass in the first degree. On appeal, Pugh contends the circuit court erred in overruling his motions to dismiss the case on the basis that the State failed to bring him to trial within the 180–day time period specified in the Uniform Mandatory Disposition of Detainers Law ("UMDDL"). He also contends the evidence was insufficient to support his conviction for trespass because the State failed to establish he had actual knowledge his entry was unlawful. For reasons explained herein, we find no error and affirm the conviction.

### FACTUAL AND PROCEDURAL HISTORY

Around 9:00 p.m. on April 16, 2010, Arlin Kettle and Julie Giesler pulled into their driveway in Fulton to find Pugh standing in the doorway of their home. Pugh had one foot inside the home and the other foot on the landing outside the door. When Pugh saw Kettle and Giesler, he yelled something to someone inside the home. He then began to run toward the back of the home. Another man ran out of the home and took off running in a different direction. Kettle recognized the other man as Ryan Strope, the son of Kettle's ex-girlfriend. Strope had lived with Kettle previously and had stolen from him in the past. Neither Pugh nor Strope had permission to be in the home.

When Kettle and Giesler saw Pugh flee, they drove their car into the backyard to follow him. As Pugh ran toward a lake that was located behind the home, Kettle got out of the car and began chasing him. Kettle heard Pugh jump into the lake, so Kettle retrieved a spotlight to enable him to see Pugh in the water. Pugh swam to the other side of the lake. Kettle caught up with Pugh as he exited the lake and continued to shine the spotlight on Pugh. According to Kettle, he and Pugh had a "verbal confrontation."

Meanwhile, Giesler called the police. As soon as Pugh heard the police sirens, he removed the wet coat he was wearing and ran from Kettle toward a cemetery, which was located near a wooded area. The police apprehended Pugh in the cemetery.

Inside Kettle's and Giesler's home, police officers discovered that several drawers had been opened, a safe had been moved from the office to the kitchen, Giesler's digital camera was missing, and three or four one-dollar bills that had been in a kitchen drawer were missing. Outside the home, officers found one pair of latex gloves next to the coat Pugh had shed and another pair of latex gloves on the path Strope had taken. Officers also found Giesler's camera, broken, on a road in the direction that Strope had fled.

On April 19, 2010, the State charged Pugh with one count of second-degree burglary, and a warrant for his arrest was issued. On May 28, 2010, Pugh filed a *pro se* motion entitled "Fast and Speedy Tri-

al/180 Writ." In the motion, Pugh stated that he was incarcerated by the Department of Corrections in Fulton and was invoking his right, under the UMDDL, to request disposition of the charge in this case.

In September 2010, the court set the case for trial on December 9, 2010, and gave it a priority setting. On December 2, 2010, Pugh filed a *pro se* motion to dismiss the case for failing to try him within 180 days. Four days later, his counsel also filed a motion to dismiss alleging violations of Pugh's statutory and constitutional rights to a speedy trial. After hearing arguments, the circuit court denied the dismissal motions.

The case proceeded to a jury trial. At the close of evidence, the court submitted instructions to the jury on second-degree burglary and the lesser-included offense of first-degree trespass. The jury found Pugh guilty of first-degree trespass, and the court sentenced him to six months in the county jail. Pugh appeals.

### ANALYSIS

■ In Point I, Pugh contends the circuit court erred in denying his motions to dismiss the case on the basis that the State failed to bring him to trial within the 180–day time period specified in the UMDDL, Sections 217.450–217.485, RSMo.[1] "Whether a criminal case should be dismissed based on the UMDDL is a question of law which the court reviews *de novo*." *State v. Sharp*, 341 S.W.3d 834, 837 (Mo.App.2011).

■ "The UMDDL provides for the prompt disposition of detainers based on untried state charges pending against a prisoner held within the state's correctional system." *Burnes v. State*, 92 S.W.3d 342, 345 (Mo.App.2003). Section 217.450.1 prescribes when and how a prisoner can make a request under the UMDDL:

> Any person confined in a department correctional facility may request a final disposition of any untried indictment, information or complaint pending in this state on the basis of which a law enforcement agency, prosecuting attorney's office, or circuit attorney's office has delivered a certified copy of a warrant and has requested that a detainer be lodged against him with the facility where the offender is confined. The request shall be in writing addressed to the court in which the indictment, information or complaint is pending ·and to the prosecuting attorney charged with the duty of prosecuting it, and shall set forth the place of imprisonment.

■ Pursuant to this statute, for an inmate to invoke the provisions of the UMDDL, a detainer must have been lodged against him. *Sharp*, 341 S.W.3d at 839; *Burnes*, 92 S.W.3d at 346. A detainer is " 'a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent.' " *Burnes*, 92 S.W.3d at 346 (quoting *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985)). The purpose of a detainer is to put prison officials on notice that the inmate is wanted to face pending charges in another jurisdiction upon the inmate's release from prison. *Id.*

■ The record in this case indicates no detainer was lodged against Pugh at the time he filed his *pro se* request for disposition of the charge on May 28, 2010. Pugh

1. All statutory citations are to the Revised Statutes of Missouri 2000, as updated by the

acknowledges a detainer had not been filed but argues that the warrant issued for his arrest upon the filing of the complaint served as the functional equivalent of a detainer.

This court recently rejected a similar argument in *Greene v. State*, 332 S.W.3d 239, 244–45 (Mo.App.2010). Noting the legislature amended Section 217.450 in 1995 to expressly require a detainer, we found the addition of such language "clearly indicates the General Assembly's intention at that time of requiring more than mere knowledge by the DOC of outstanding warrants to trigger the UMDDL." *Id.* at 245. Therefore, we held that no *de facto* detainer arises "merely from the existence of the warrant" and that "[n]otice of the warrant, by itself, [does] not constitute a detainer." *Id.* at 245–46.

■ We find no reason in this case to depart from our holding in *Greene*. The warrant for Pugh's arrest was not the functional equivalent of a detainer, particularly when, unlike in *Greene*, Pugh does not contend that the Department of Corrections was even aware of it. "Absent the court's finding that a detainer was already filed, or the functional equivalent, a defendant's premature request for disposition of charges does not trigger the 180–day time limit." *Sharp*, 341 S.W.3d at 839. Because Pugh's *pro se* speedy trial request did not effectively invoke the protections of the UMDDL, the circuit court did not err in denying his motions to dismiss. Point I is denied.

■ In Point II, Pugh contends the evidence was insufficient to support his conviction for first-degree trespass. When reviewing a challenge to the sufficiency of the evidence, our role "is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). We consider the evidence and inferences in the light most favorable to the verdict, disregarding all contrary evidence and inferences. *Id.* at 407–08. We defer to the jury's credibility determinations, recognizing the jury was entitled to believe "all, some, or none" of the testimony of the witnesses. *Id.* at 408.

■ The jury found Pugh guilty of first-degree trespass. "A person commits the crime of trespass in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure or upon real property." § 569.140.1. Pugh concedes there was evidence to support the jury's finding that he entered into Kettle's and Giesler's home. He argues the evidence was insufficient, however, to establish that he *knowingly* entered *unlawfully* into the home. A person acts knowingly "[w]ith respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist." § 562.016.3(1). Because "[d]irect proof that a person acted 'knowingly' is often unavailable," knowledge may be "inferred from evidence of the circumstances surrounding the incident." *State v. Fackrell*, 277 S.W.3d 859, 863–64 (Mo.App.2009). A person enters unlawfully "in or upon premises when he is not licensed or privileged to do so." § 569.010(8). Hence, to establish Pugh knowingly entered unlawfully into Kettle's and Giesler's home, the State had to show he was aware that he had neither license nor privilege to enter. *State v. Jackson*, 896 S.W.2d 75, 77 (Mo. App.1995).

The circumstances surrounding this incident demonstrate that Pugh was aware he had neither license nor privilege to enter Kettle's and Giesler's home. Although Pugh contended that he thought he was

privileged to enter the home to pick up Strope, when he realized that Kettle and Giesler saw him standing in the doorway of their home, he ran from the home and attempted to flee, going so far as to jump into a lake and swim across it. After he exited the lake and heard the police sirens, he shed his wet coat, dropped a pair of latex gloves next to his coat, and continued to run before the police apprehended him.

Pugh's flight from the scene indicates his consciousness of guilt. *State v. McLaughlin*, 272 S.W.3d 506, 511 (Mo. App.2008). If Pugh truly believed he was privileged to enter the home, he had no reason to run without explaining his presence to Kettle or Giesler. Likewise, if he truly believed he was privileged to enter the home, he had no reason for having latex gloves, which he attempted to discard before the police caught him. A reasonable inference is that Pugh had the latex gloves because he knew he had neither license nor privilege to be in Kettle's and Giesler's home and did not want to leave his fingerprints. From this evidence, a reasonable juror could have found that Pugh was aware his entry into Kettle's and Giesler's home was unlawful. Sufficient evidence supports Pugh's conviction for trespass in the first degree. Point II is denied.

#### Conclusion

We affirm the circuit court's judgment of conviction.

All Concur.