**STATE of Missouri, Respondent,**

v.

**Joe Pat CARL, Appellant.**

**No. WD 74664.**

Missouri Court of Appeals, Western District.

Jan. 15, 2013.

---

J. Eric Mitchell, Clinton, MO, for Appellant.

Timothy Blackwell, Jefferson City, MO, for Respondent.

Before JAMES EDWARD WELSH, C. J., MARK D. PFEIFFER, J., and ABE SHAFER, Sp. J.

JAMES EDWARD WELSH, Chief Judge.

Joel Pat Carl[1] appeals from a judgment entered upon a jury verdict convicting him of one count of possession of a controlled substance and one count of attempt to manufacture a controlled substance. Carl asserts five points on appeal. First, Carl contends that the circuit court erred in overruling his motion to dismiss because the State failed to bring him to trial within 180 days as required by the Uniform Mandatory Disposition of Detainers Law (UMDDL), section 217.450, RSMo Cum. Supp.2009, and violated his right to a speedy trial. Second, Carl asserts that the court erred in overruling his motion to quash Mark Plumb as a late endorsed witness contending that, the late endorsement was prejudicial to him as he had an inadequate amount of time to prepare for Plumb's testimony. Third, Carl claims that the court erred in overruling his motion for judgment of acquittal because there was insufficient evidence to support the guilty verdicts. Fourth, Carl contends that the court erred when, after once giving the hammer instruction, the court advised the jury to continue deliberations when it indicated a potential deadlock a second time and, on the third indication of potential deadlock, instructed a law enforcement officer to orally advise the jury to continue deliberations. Carl claims that the court's actions prejudiced him and appeared to coerce the jury's verdict. Finally, Carl asserts that the court erred in allowing the opinion testimony of Agent Shayne Simmons regarding the materials and equipment being used in a methamphetamine lab because Simmons was not disclosed nor qualified as an expert and his testimony was speculative. We affirm.

On September 1, 2010, the St. Clair County Prosecuting Attorney filed a Complaint against Carl alleging that on August 14, 2009, Carl was in possession of a controlled substance and attempted to manufacture a controlled substance.[2] On October 1, 2010, Carl appeared with counsel and was given a preliminary hearing date of November 5, 2010. On October 8, 2010, Carl filed a motion for speedy trial. On October 12, 2010, Carl filed a "Motion of 180 Writ." On December 6, 2010, Carl was arraigned. On that date, Carl moved for a change of venue, and the case was transferred to the Circuit Court of Bates County. The case was received in Bates County on December 8, 2010. A special prosecutor was appointed to the case on January 14, 2011, and entered his appearance on behalf of the State on January 27, 2011. On February 17, 2011, the State filed a motion requesting a trial setting. In that motion, the State did not concede applicability of the UMDDL but indicated that, because Carl referenced his incarceration at the time he filed his request for a speedy trial, the request might be considered as having been filed pursuant to the UMDDL. The motion stated that "[s]hould the Defendant's request be considered as having been made pursuant to the Uniform Mandatory Disposition of Detainers law, trial in this case must be held within 180 days of the date which the Defendant filed his request, or this case must be dismissed."

On February 22, 2011, the parties met to set a trial date, and the court made the

1. Charged as "Joe" Pat Carl.

2. As specifics regarding Carl's crimes are irrelevant to four of Carl's points, additional relevant facts are found below in Carl's third point on appeal regarding the sufficiency of the evidence.

following docket entry: "Case set for trial on the week of 7/26/11. Pre-trial set for 7/18/11 @ 10:00 am. Deft [*sic*] waives request for disposition of detainer & speedy trial." On July 18, 2011, the State moved for a continuance in the matter, indicating in the motion that the State's attorney had a previously scheduled matter in St. Louis County on July 25, 2011, which was expected to take the entire week. On July 21, 2011, the court, by way of telephone conference, took up the motion, and the State indicated that one of its witnesses would be unavailable for the original trial date as the State had failed to timely notify the witness of the setting date. The court granted the State's motion over Carl's objection but noted that, "due to the court's schedule in light of the defendant's speedy trial request, the court will assign another available judge to hear the case." A new judge was assigned, and Carl's trial was thereafter scheduled for August 31, 2011. On August 10, 2011, Carl moved to dismiss his case contending that the Court was without jurisdiction to proceed in the matter because the UMDDL had been violated, as had his Constitutional right to a speedy trial. Carl claimed that, although he had previously agreed to a trial outside of 180 days to accommodate the State and the court, he had not agreed to a continuance and, therefore, his case should be dismissed because his trial was scheduled outside of the 180 day speedy trial period. The court overruled the motion, and Carl's case was heard on August 31, 2011, and September 1, 2011.

In his first point on appeal, Carl contends that the court erred in overruling his motion to dismiss because the State failed to bring him to trial within 180 days, as required by the UMDDL, and violated his right to a speedy trial. We disagree.

Whether the UMDDL requires dismissal of Carl's criminal case and whether Carl's sixth amendment right to a speedy trial has been violated are both questions of law reviewed *de novo*. *State v. Pugh*, 357 S.W.3d 310, 313 (Mo.App.2012); *State v. Washington*, 9 S.W.3d 671, 675 (Mo.App. 1999).

■ Section 217.450.1 of the UMDDL provides:

Any person confined in a department correctional facility may request a final disposition of any untried indictment, information or complaint pending in this state on the basis of which a law enforcement agency, prosecuting attorney's office, or circuit attorney's office has delivered a certified copy of a warrant and has requested that a detainer be lodged against him with the facility where the offender is confined. The request shall be in writing addressed to the court in which the indictment, information or complaint is pending and to the prosecuting attorney charged with the duty of prosecuting it, and shall set forth the place of imprisonment.

Section 217.460, RSMo Cum.Supp.2009, of the UMDDL provides, in part:

Within one hundred eighty days after the receipt of the request and certificate, pursuant to sections 217.450 and 217.455, by the court and the prosecuting attorney or within such additional necessary or reasonable time as the court may grant, for good cause shown in open court, the offender or his counsel being present, the indictment, information or complaint shall be brought to trial. The parties may stipulate for a continuance or a continuance may be granted if notice is given to the attorney of record with an opportunity for him to be heard. If the indictment, information or complaint is not brought to trial within the period and if the court finds that the offender's constitutional right to a speedy trial has been denied, no court of

this state shall have jurisdiction of such indictment, information or complaint, nor shall the untried indictment, information or complaint be of any further force or effect; and the court shall issue an order dismissing the same with prejudice.

We have previously concluded that section 217.450.1 requires that a detainer must be lodged against an inmate in order for the inmate to invoke the UMDDL. *Pugh*, 357 S.W.3d at 313. A detainer is "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." *Id.* (internal citations and quotations omitted.) "The purpose of a detainer is to put prison officials on notice that the inmate is wanted to face pending charges in another jurisdiction upon the inmate's release from prison." *Id.* Here, while Carl indicates that his pro se "Motion of 180 writ" was received by the court on October 12, 2010, there is no indication in the record that a detainer was ever lodged against Carl. Absent the court's finding that a detainer was filed, Carl's premature request for disposition of charges did not trigger the 180–day time limit under the UMDDL. *Id.* at 314.

Additionally, we note that on February 17, 2011, the State requested a trial setting on the grounds that, in the event that the UMDDL applied to Carl's case, the trial would need to be held within 180 days of the date Carl requested the speedy trial. In response, the parties met on February 22, 2011, to determine a trial date. Carl concedes that he then agreed to the trial date of July 26, 2011. The court made the following docket entry: "Case set for trial on the week of 7/26/11. Pre-trial set for 7/18/11 @ 10:00 am. Deft [*sic* ] waives request for disposition of detainer & speedy trial." Therefore, even if there was a detainer, Carl waived the continued applicability of the UMDDL. Once having waived his request for disposition of detainer, Carl may have been required to affirmatively reassert his demand. We need not address this issue, however, as even if the waiver was a partial one and only applied from February 22, 2011, until July 26, 2011, his argument still fails. Carl's argument that, because he did not agree to continuing his case after July 26, 2011, his waiver from February to July should be computed in the 180 day time frame is without merit.[3] *See State v. Johnson*, 328 S.W.3d 385, 391–93 (Mo.App. 2010) (where the court painstakingly assessed accrued and tolled periods of time per the UMDDL). The total number of days that elapsed from the date of Carl's request until his trial, less tolled periods, did not exceed 180[4] days.

While a defendant's right to a speedy trial under the Sixth Amendment

---

3. Additionally, section 217.460 allows for a hearing to take place within 180 days "or within such additional necessary or reasonable time as the court may grant, for good cause shown in open court." Section 217.460 also allows for continuances. "The 180–day limitation is not absolute." *State v. Smith*, 686 S.W.2d 543, 547 (Mo.App.1985).

4. Time computation commenced on October 13, 2010, and ran until February 22, 2011. Carl's filing for change of venue tolled the time for two days between the granting of the change of venue on December 6, 2010, and Bates County receiving the transfer on December 8, 2010. *State v. Galvan*, 795 S.W.2d 113, 118 (Mo.App.1990). Therefore, the initial delay totals 131 days. The time from February 23, 2011, to July 26, 2011, is excluded as Carl agreed to this delay. While Carl did not agree to the delay from July 26, 2011, to August 31, 2011, the UMDDL allows for continuances. Regardless, even if this delay period of 36 days is included, the total delay period prior to trial computes to only 167 days.

can still be violated even if the UMDDL is inapplicable, this is not the case here. "The determination of whether there has been a violation of speedy trial rights involves a balancing process." *State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 911 (Mo. banc 2010). The court is to consider and balance all of the circumstances including the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* If the length of the delay is not presumptively prejudicial, however, we deem no rights to have been violated and need not inquire into the other three factors. *Id.* "Missouri courts have found that a delay of greater than eight months is 'presumptively prejudicial.'" *Id.* Here, there is no presumption of prejudice as the delay in this case was only seven months.[5]

■ Carl was charged on September 1, 2010, and, on February 22, 2011, agreed to the trial date of July 26, 2011. Approximately six months elapsed from the date Carl was charged until the date he agreed to a July trial date. Because Carl agreed to this trial date, we do not consider the time that elapsed between February 22, 2011, and July 26, 2011. In determining whether delays are presumptively prejudicial, delays "attributable to the defendant's continuances, motions, or other actions must first be subtracted from the total delay." *State v. Davis*, 903 S.W.2d 930, 936 (Mo.App.1995). Carl objected to continuing the case from July 26, 2011, to August 31, 2011, so we add that month to the total delay period. Ultimately, the total delay period computes to only seven months, which falls one month short of presumptive prejudice. Therefore, the court did not err in overruling Carl's motion to dismiss. Neither the Uniform Mandatory Disposition of Detainers Law nor Carl's right to a speedy trial were violated. Point one is denied.

■ In Carl's second point on appeal, Carl contends that the court erred in overruling his motion to quash Mark Plumb as a late endorsed witness because Plumb was not endorsed until five days prior to trial and, therefore, the late endorsement prejudiced him as he had inadequate time to prepare for Plumb's testimony.

■ "The trial court ... has broad discretion in determining whether a late endorsed witness should be permitted to testify and this Court will reverse only for an abuse of discretion which results in fundamental unfairness." *State v. Trotter*, 241 S.W.3d 860, 862 (Mo.App.2007). In determining whether there was an abuse of discretion, we consider many factors, including whether the defendant waived the objection, whether the State intended surprise or acted in bad faith, and whether the defendant was in fact surprised or disadvantaged. *Id.* Fundamental unfairness occurs when the defendant experiences genuine surprise, and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence. *State v. Thompson*, 985 S.W.2d 779, 785 (Mo. banc 1999).

---

5. To avoid confusion, it may be worth noting that computation of time under the UMDDL and computation of time to determine presumptive prejudice per the Sixth Amendment may often be different. This is because "[t]he protections of the speedy trial provision attach when there is a formal indictment or information or when actual restraints are imposed by arrest and holding to answer a criminal charge." *State ex rel. Garcia v. Goldman*, 316 S.W.3d at 911 (citations omitted). Protections under the UMDDL attach when receipt of the defendant's request for a trial within 180 days per the UMDDL is received by the court and prosecuting attorney. § 217.460; *State v. Morrison*, 364 S.W.3d 779, 786 (Mo.App.2012).

Here, there was no fundamental unfairness. When Carl raised objections to the late endorsement of Plumb, the court gave Carl the opportunity to interview Plumb. When the State indicated to the court that "[t]he defendant has a right to request a continuance if he thinks he needs a continuance." The court responded: "You're right, he does. And if you want the continuance to do your investigation, we can reset this." The record reflects that Carl thereafter took Plumb's deposition but did not request a continuance. Therefore, Carl was not prevented from considering and preparing a strategy for addressing Plumb's testimony.

Carl argues that the court should have excluded Plumb as a witness because the State had no reasonable justification for the failing to disclose the witness. *See State v. Martin*, 103 S.W.3d 255, 261 (Mo. App.2003). In so arguing, Carl does not claim that the State knew about the potential witness and lacked diligence in pursuing and endorsing him. Rather, Carl admits that "the witness was not even known about until one week prior to the trial. . . ." The record confirms this as the State argued before the court on Carl's motion to quash Plumb that the State was approached by Plumb's attorney in court approximately one month prior to trial and advised that Plumb had some information regarding Carl that the State might be interested in. The State expressed an interest in speaking with Plumb but was thereafter unable to reach Plumb's attorney. Finally, approximately one week prior to trial, the State made contact with Plumb's attorney and thereafter spoke with Plumb. The same day the State spoke with Plumb, it endorsed Plumb as a witness. Hence, there is no evidence that the State intended surprise, acted in bad faith, or could have disclosed the witness sooner.

We conclude that the court did not abuse its discretion in allowing the late endorsement of Plumb. The parties agree that the State was unaware of the witness until just prior to trial, and Carl was afforded the opportunity to investigate the witness and request a continuance if additional investigation was necessary. Point two is denied.

In his third point on appeal, Carl argues that the court erred in overruling his motion for judgment of acquittal at the close of the State's evidence and the close of all evidence because there was insufficient evidence to support a guilty verdict for possession of a controlled substance, in violation of section 195.202.1, RSMo 2000, and for attempt to manufacture a controlled substance, in violation of section 195.211.1, RSMo Cum.Supp.2003.

In reviewing the sufficiency of the evidence, we accept as true all evidence favorable to the State, and disregard all evidence and inferences to the contrary. *State v. Crawford*, 68 S.W.3d 406, 407–408 (Mo. banc 2002). Our review is "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* at 408. When reviewing sufficiency of the evidence to support a criminal conviction, we do not act as a 'super juror' with veto powers but greatly defer to the jury's findings. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). We find the evidence in this case sufficient for a reasonable juror to have found Carl guilty of possession of a controlled substance and attempt to manufacture a controlled substance.

Section 195.202 prohibits possession of a controlled substance. *State v. Tomes*, 329 S.W.3d 400, 403 (Mo.App. 2010). To sustain a conviction, the State must prove (1) conscious and intentional possession of the substance, either actual

or constructive, and (2) awareness of the presence and nature of this substance. *Id.* When, as here, the defendant is not found in actual possession of the substance, the State must prove constructive possession by circumstantial evidence. *Id.*

Constructive possession requires proof that a defendant had access to and control over the premises where the drugs were found. [*State v.*] *Metcalf*, 182 S.W.3d [272] at 275 [ (Mo.App. E.D. 2006) ]. In cases where the premises were jointly possessed, further evidence is required to connect a defendant to the controlled substance. *Id.* In determining the sufficiency of such evidence, we consider the totality of the circumstances, including: "routine access to the area where the substances are kept, the presence of large quantities of the substance at the arrest scene, admissions by the accused, being in close proximity to the substances or drug paraphernalia in plain view of the law enforcement officers, the mixing of defendant's personal belongings with the drugs, or flight by a defendant upon realizing the presence of law enforcement officials." *Id; see also State v. Beggs,* 186 S.W.3d 306, 317 (Mo.App. W.D.2005).

*Id.*

 Carl was charged with acting alone or knowingly in concert with another to possess a controlled substance. Therefore, the State had the burden of proving beyond a reasonable doubt that, (1) Carl and/or another person possessed a controlled substance, (2) Carl knew or was aware of the presence or nature of the controlled substance, and (3) that with the purpose of promoting or furthering the commission of possession of the controlled substance, Carl acted alone or together with or aided another in committing the offense. *State v. Jackson,* 304 S.W.3d 791, 795 (Mo.App.2010). Possession, under section 195.202, RSMo 2000, includes both sole and joint possession. *Id.* "Constructive possession will suffice, even when joint control exists, as long as other facts buttress an inference that [Carl] had knowledge of the drug's presence." *Id.*

Here, the evidence shows that methamphetamine was found inside a yellow container located in a dresser drawer in a computer room of a home shared by Carl and his girlfriend, Shauna Kennicut. While Carl claims that Kennicut admitted to authorities that the methamphetamine was hers, the record only reflects that she indicated that items in the area where the drugs were found were hers. Detective Arlynn Tucker of the St. Clair County Sheriff's Department was asked on cross-examination, "When you located this, Miss Kennicut told you it was hers, didn't she?" Tucker replied, "She did not tell me, no." Carl's counsel then asked, "You heard her admit it was hers, did you not?" Tucker replied, "She stated that items in there were hers, yes.... [i]n the area where that was located, yes."

Methamphetamine was also found on a dresser in a bedroom of the residence. The methamphetamine from the bedroom was located inside of a small, zip-style bag that had a picture of a gun on it. The bag was found inside of a box that contained make-up. Carl's birth certificate was on a headboard in the bedroom where the drugs were located. Men's and women's clothing were in the bedroom, separated from each other in a drawer and mixed together in a laundry basket.

We find the evidence that, methamphetamine was found in two places within Carl's residence, where Carl had routine access and where his personal belongings were found, was sufficient for a reasonable juror to have determined that Carl had constructive possession and/or that he

shared constructive possession of the methamphetamine. The fact that Carl was also attempting to manufacture methamphetamine would additionally support a reasonable juror's conclusion that he also possessed the methamphetamine that was found within his residence. *See State v. Gonzalez,* 108 S.W.3d 209, 212 (Mo.App. 2003).

■■■■■ Carl was convicted of attempt to manufacture a controlled substance in violation of section 195.211.

An attempt to commit a crime has two elements: "(1) the defendant has the purpose to commit the underlying offense, and (2) the doing of an act which is a substantial step toward the commission of that offense." *State v. Withrow,* 8 S.W.3d 75, 78 (Mo. banc 1999). "'A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.'" *Id.* (quoting section 564.011). Conduct constituting a substantial step includes possession of materials designed specifically for an unlawful purpose or that could not serve a lawful purpose under the circumstances. *State v. Molasky,* 765 S.W.2d 597, 600–01 (Mo. banc 1989).

*State v. Farris,* 125 S.W.3d 382, 387 (Mo. App.2004).

When examining whether Carl took a substantial step toward the manufacture of methamphetamine by possessing materials used to manufacture the substance, we apply the same standard of actual or constructive possession as used in possession cases. *Id.* Therefore, as Carl was not found in actual possession of the manufacturing materials, the State had to prove constructive possession by showing that he had access to and control over the premises where the materials were found. *Id.* Because Carl did not have exclusive control over the premises, the State was re-

quired to present incriminating evidence to raise the inference of his knowledge and control over the manufacturing materials. *Id.* at 387–388.

Here, a former friend of Carl, Mark Plumb, testified that Carl contacted him after law enforcement searched Carl's residence. Plumb testified that Carl stated that his "house had been raided" and that the police had found drugs. Plumb also testified that he and Carl had cooked methamphetamine outside of a shed on Carl's property. He indicated that during these events, various people brought ingredients to the cook, such as pills and batteries, in order to manufacture the substance. Plumb indicated that prior to the police raid on the property, he and Carl cooked methamphetamine approximately "every other week." He indicated that the frequency with which they cooked the drug depended on whether they could get the drug from someone else or, as a last resort, had to cook it themselves. At trial, Plumb identified some of the materials police found in the shed as materials used when he and Carl cooked methamphetamine. Plumb additionally testified that, after police raided Carl's property, he, Carl, and Kennicut devised a plan to backdate a rental agreement and have a previous tenant of the shed, Rory Coleman, sign the agreement. Plumb reasoned that, if the police had found anything on the property, the rental agreement would implicate Coleman.

Detective Arlynn Tucker of the St. Clair County Sheriff's Office testified that, based on his training and experience as a narcotics officer, he was familiar with some of the ingredients and equipment used to manufacture methamphetamine. Tucker concluded that many items found in Carl's shed, including hot plates, aluminum foil, Pyrex dishes, hoses, funnels, rock salt, scales, camp fuel, Heet, acid, and a respi-

rator mask, were items "commonly used for meth labs."

We conclude that there was sufficient evidence for a reasonable juror to find that Carl attempted to manufacture or produce methamphetamine. The evidence sufficiently showed that Carl took a substantial step toward manufacturing methamphetamine by possessing materials designed for such purpose, knew of the presence of the manufacturing process that was located on property where he resided, and that the manufacturing materials or the manufacturing process was under his control. Point three is denied.

In his fourth point on appeal, Carl contends that the court erred in giving the hammer instruction to the jury, advising the jury to continue deliberations, and instructing a law enforcement officer to orally advise the jury to continue deliberations when the jury was deadlocked. We find no error.

Carl failed to raise this claim in his motion for new trial pursuant to Rule 29.11(d). Therefore, our review of this point is limited to plain error. Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc), cert. denied, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. If, however, we con-

clude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc), *cert. denied*, — U.S. —, 130 S.Ct. 144, 175 L.Ed.2d 93 (2009). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear." *Id.* (citations and internal quotation marks omitted). In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* We conclude that Carl's claim does not facially establish substantial grounds for believing that he has been a victim of manifest injustice.

Here, after closing arguments, and in the presence of the jury, the court instructed Bailiff Poulter that he was charged with watching over the jury, that he was to keep the jury together in a private room and not permit any person to communicate with any of its members, and that he would not do so himself, unless by order of the Court. The jury then retired to deliberate at 4:34 p.m. At 7:20 p.m. the jury sent a note to the court indicating that they were deadlocked seven to five on the possession count and eight to four on the attempt count. No objection was made to the court issuing a "hammer instruction" pursuant to MAI–CR 312.10. The court addressed the jury at 7:30 p.m. and stated:

> You should make every reasonable effort to reach a verdict as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have

them respect yours. And, in the spirit of tolerance and understanding, endeavor to bring the deliberations as a whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the Defendant's guilt beyond a reasonable doubt.

I'm giving you this last instruction and asking you to return to the jury room and see if you can reach a consensus on either count.... Bailiff. Preferably both counts. All right. I'm sending the instruction back to you to join the rest of them.

Forty minutes later, the jury issued another note indicating that they were ten to two on the possession charge and eight to four on the attempt charge. Counsel and the court discussed the matter, and Carl's counsel did not object to the court sending a note to the jury requesting that they refer to Instruction 13, which was the hammer instruction, and continue to deliberate. Carl's counsel suggested to the court that the court could also call a mistrial but did not move for a mistrial. Less than an hour later, the jury returned another note indicating that they had reached a verdict on the possession charge and moved to 9–3 on the attempt to manufacture charge. The record reflects no objection to the court then instructing Bailiff Poulter to, "Tell them to refer to my last note, please." Approximately an hour later, the jury returned a verdict of guilty on both counts.

Carl asserts that the first hammer instruction was appropriate but that the two additional instructions were improper because it forced the jury to deliberate and Bailiff Poulter's communications with the jury gave the "appearance of coercion in favor of the State." We find no error.

■■■■ "A trial court may give the hammer instruction when it 'deems it appropriate and when the length of deliberation or communication from the jury causes the Court to believe that the jury may be deadlocked.'" *State v. Fassero*, 256 S.W.3d 109, 116 (Mo. banc 2008) (quoting MAI–CR3d 312.10, Notes on Use 2). The court abuses its discretion by issuing the hammer instruction when the instruction coerces the jury's verdict. *State v. Bracken*, 333 S.W.3d 48, 56 (Mo.App.2010). A verdict is coerced when "under the totality of the circumstances it appears that the trial court was virtually directing that a verdict be reached and by implication it would hold the jury until a verdict was reached." *Id.* (quoting *State v. Johnson*, 948 S.W.2d 161, 164 (Mo.App.1997)).

Here, there is no evidence of coercion. The instruction is clear that a juror is to only agree to a verdict of guilty if he or she is convinced of the defendant's guilt beyond a reasonable doubt. The jury deliberated less than three hours when it indicated possible deadlock and thereafter received the first hammer instruction. The two subsequent times the jury indicated possible deadlock, it had only deliberated a short while, and it was clear that there was movement toward a verdict during deliberations. Bailiff Poulter's role as a liaison between the court and jury was made apparent to the jury when Poulter took an oath in the jury's presence that he would watch over the jurors but would not communicate with them unless by order of the court. The fact that Poulter was an officer of the court who followed the court's order to advise the jury to "refer to

my last note" does not suggest coercion.[6] As Carl does not prove that the court's hammer instructions coerced the jury's verdict, he does not facially establish substantial grounds for believing that he has been a victim of manifest injustice. Point four is denied.

■ In Carl's fifth point on appeal, Carl asserts that the court erred in allowing Agent Shayne Simmons, of the multi-jurisdictional Community Narcotics Enforcement Team, to give his opinion as to materials and equipment being used in a methamphetamine lab because Simmons was not disclosed as an expert, not qualified as an expert, and his testimony was speculative.

Carl failed to raise this claim in his motion for new trial pursuant to Rule 29.11(d). Therefore, our review of this point is limited to plain error pursuant to Rule 30.20. We find that Carl's claim does not facially establish substantial grounds for believing that he has been a victim of manifest injustice. The record reflects that Simmons's testimony was cumulative to the testimony of Detective Arlynn Tucker, of the St. Clair County Sheriff's Department, which was received without objection. Tucker was asked:

> As to all items that we have discussed; hot plates, aluminum foil, Pyrex dishes, hoses, funnels, rock salt, scales, camp fuel, Heet, acid, a respirator mask, based on your many hours of training in drug enforcement and the hundreds of meth labs, or hundred to 200 meth labs you say you have investigated, do you

have an opinion as to what all this could be used for?

Tucker answered: "It is used for—commonly used for meth labs."

Simmons was asked nearly the same question and Simmons answered in nearly the same manner. He was asked: "[B]ased on what you viewed there at the residence, do you have an opinion as a trained and experienced investigator as to what the items that you found primarily in the shed could be used for?" Simmons's opinion: "They were used in manufacturing methamphetamine [.]" Therefore, even if Simmons's opinion testimony had been improper because he was not endorsed as an expert, his testimony was cumulative to testimony that had already been heard by the jury. Carl fails to show that allowing the testimony made him a victim of manifest injustice.[7] Point five is denied.

We, therefore, conclude that the circuit court did not err in overruling Carl's motion to dismiss. Neither the UMDDL nor Carl's right to a speedy trial were violated. Second, the court did not err in allowing the late endorsement of Plumb. The parties agree that the State was unaware of the witness until just prior to trial and that Carl was afforded the opportunity to investigate the witness and request a continuance if additional investigation was required. Third, the court did not err in overruling Carl's motions for acquittal. There was sufficient evidence to find Carl guilty of possession of a controlled substance and attempt to manufacture a controlled substance. Fourth, the court did

---

6. Best practice dictates all communications with the jury be in writing or in open court on the record. If in writing each communication should be signed by the author.

7. Additionally, we note that Carl does not contend that Simmons was not endorsed as a witness, only that he was not endorsed as an expert. Carl makes no claims that the State intended surprise or acted deceptively or in bad faith intending to disadvantage him, that he was surprised by the testimony and suffered a disadvantage as a result, or that the testimony could not have readily been contemplated. *See State v. Hendrix,* 883 S.W.2d 935, 938 (Mo.App.1994).

not err in issuing the hammer instructions to the jury. Carl presented no evidence that the instructions prejudiced him by coercing the jury's verdict. Finally, the court did not err in allowing the opinion testimony of Agent Simmons. The limited opinion testimony was cumulative to testimony that was admitted without objection. We affirm the circuit court's judgment.

All concur.