JEFFREY W. BATES, J.
Epifanio Chaidez (Defendant) was charged via a five-count, amended information with committing the following offenses involving his girlfriend's daughter, T.N. (Victim), over an eight-year period: one count of first-degree statutory sodomy involving a child less than 12 years old (Count 1); first-degree statutory rape (Count 2); two counts of first-degree statutory sodomy involving a child less than 14 years old (Counts 3-4); and one count of second-degree statutory rape (Count 5). See §§ 566.062, 566.032, 566.034.[1] A jury found Defendant guilty on all five counts. He was sentenced to serve four 20-year terms in prison on Counts 1-4, and a seven-year sentence on Count 5, with all of the sentences to run concurrently.
On appeal, Defendant presents two points for decision. He contends the trial court abused its discretion by: (1) admitting testimony about "late disclosure in victims of sexual abuse" and "sexual abuse accommodation syndrome" because such testimony was "improperly used to bolster [Victim's] credibility"; and (2) allowing the State's late endorsement of the DNA lab co-director, because her "testimony that [Defendant] was almost certainly the father of [Victim's] child was critical evidence against him." Finding no merit in either point, we affirm.
Defendant does not contest the sufficiency of the evidence to support his convictions. "We consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences." State v. Campbell , 122 S.W.3d 736, 737 (Mo. App. 2004) ; see also State v. Johns , 34 S.W.3d 93, 103 (Mo. banc 2000). Viewed from that perspective, the following facts were adduced at trial.
In 2000, when Victim was five years old, she lived with her aunt and uncle in Springfield, Missouri. When Victim was eight, her mother, G.N. (Mother) moved in with the family. A year later when Victim was nine, Mother moved out, taking Victim with her to live in a nearby house. Shortly after that move, Defendant began dating Mother. He also moved into the house. After Defendant began to reside there, Victim was not allowed to go anywhere after school or have friends visit at the house. Victim was no longer allowed to spend the night with her aunt and uncle or any family members; instead she was required to stay at the house with Defendant. From the time he moved into the *666 house until Victim was 16 years old, Defendant and Mother had three children together.
A few months after Defendant moved into the house, he asked Victim to lie in bed with him while Mother was at work. He put his hands down Victim's pants and rubbed her vagina. Defendant then put his penis on Victim's vagina. Victim did not tell anyone about Defendant's actions because Defendant and Mother were in an abusive relationship and Defendant intimidated Victim, then still nine years old.
After these first events, Defendant continued touching Victim's vagina with his hands or his penis a couple of times per week. When the family moved into a different house in Springfield, Defendant started touching Victim twice daily. At 11 years of age, Victim briefly resided with her aunt and uncle because Defendant was having an affair with another woman, and Mother had moved to North Carolina. Victim did not tell her aunt or uncle about the abuse because she was still afraid of Defendant, and she did not want her uncle to fight Defendant.
A few months later, Mother and Victim moved back into a house with Defendant, and he began having sexual intercourse with Victim. Victim was 12 years old the first time Defendant had sex with her. When she was 12 to 14 years of age, Defendant continued having sex with Victim. Defendant also began giving Victim oral sex and forcing Victim to perform oral sex on him. During this time period, Defendant would sometimes have sex with Victim multiple times per day, and Defendant touched Victim's vagina with his hands daily.
When Victim was 14 years of age, Defendant began ejaculating inside Victim. She became pregnant when she was 16 years of age. Victim told Defendant that she was pregnant. Defendant told Victim to tell Mother that the father was a foreign exchange student so Mother "would never go looking for him." Victim was scared and told no one else she was pregnant. Victim's grandmother (Grandmother) saw Victim when she was six months pregnant and made a comment about Victim's weight. Victim said she was eating too much and did not tell Grandmother that she was pregnant.
Victim hid her pregnancy until she went into labor. She was afraid people would suspect Defendant was the father because she never went anywhere outside the house. Victim delivered her baby (Son) at the hospital in October 2012, when she was 17 years old. Defendant arrived at the hospital intoxicated and yelled that he wanted to know who the father was because he wanted the father arrested. As Defendant had earlier instructed Victim, she told Mother and Grandmother that the father was a foreign exchange student. When Grandmother had arrived at the hospital, however, she saw Defendant "bent over [Victim] whispering to her, rubbing her stomach." After Grandmother got Defendant to leave, she asked Victim if Defendant was the father, but Victim said "No." Grandmother did not believe that answer, but she stopped asking Victim about it because Mother insisted Grandmother was wrong.
After Victim came home from the hospital, Defendant tried to have sex with her. She refused. Defendant became angry and began treating Victim differently. During this time, Mother was in prison. Defendant still lived in the house with Victim, her three younger siblings, and Son. In July 2013, Victim moved out of the house after she and Defendant "got into a big fight." Defendant had come home intoxicated. When Victim refused to make dinner, Defendant pulled a knife out of the kitchen drawer and pointed it at her while she was *667 holding Son. Victim ran to the garage and, while holding the door shut against Defendant, she called Grandmother to come get her. Defendant threw Victim's belongings outside, and Grandmother picked up Victim and Son.
In October 2013, Victim was filling out a Medicaid form and was upset because the form asked for the name of Son's father. Grandmother told her she could get into trouble for lying and she had to tell the truth on the form. Victim began crying and told Grandmother that Defendant was Son's father. Grandmother called the police and reported the abuse.
Detective Corporal Christina Flood (Det. Flood) with the Springfield Police Department interviewed Victim, who listed all of the locations where she had been sexually abused over the years by Defendant. Following Defendant's arrest, Det. Flood interviewed Defendant. The detective also obtained a buccal swab from him. As part of the investigation, Sergeant Heather Anderson (Sgt. Anderson) took buccal swabs from Victim and Son. All three swabs were tested for DNA. According to the lab co-director, Dr. Karol Elias (Dr. Elias), the results of the DNA tests indicated that Defendant was Son's father.
At trial, those testifying for the State included Victim, Grandmother, Det. Flood, Sgt. Anderson and Dr. Elias. The State also presented testimony from Micki Lane (Lane), a forensic interviewer and training coordinator for the Child Advocacy Center. She had not met with Victim. Lane testified about the reasons why a child who has been sexually abused might not disclose abuse and instead learn to accommodate the abuse.
The State also presented evidence concerning Det. Flood's interview of Defendant. That interview was recorded and played for the jury. In the recording, Defendant denied the charges, but he had no explanation for the DNA results.
In Defendant's case, he presented testimony from Mother. In defense counsel's opening and closing statements, he argued that Victim was not to be believed and questioned why she didn't "say anything to anybody for years...." After the jury found Defendant guilty as charged, Defendant waived jury sentencing and was sentenced by the court. This appeal followed. Additional facts necessary to the disposition of the case will be included below as we address Defendant's two points on appeal.
Point 1
Defendant's first point challenges the trial court's ruling to admit Lane's testimony about late disclosure by child victims of sexual abuse. A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion. State v. Hunt , 451 S.W.3d 251, 263 (Mo. banc 2014). A trial court abuses its discretion only if its decision to admit evidence "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." State v. Gonzales , 153 S.W.3d 311, 312 (Mo. banc 2005). Claims of trial court error are reviewed for prejudice, not mere error. State v. Clark , 364 S.W.3d 540, 544 (Mo. banc 2012). This Court will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial. Id . The following facts are relevant to this point.
Prior to trial, defense counsel filed a motion in limine to exclude Lane's testimony. The court took the issue under advisement and instructed the State that a ruling would be made if Lane's expertise was established at trial at a hearing outside of the jury's presence. During that hearing, *668 Lane responded to questions about her training and experience in the profiles of child-abuse victims. Based on her experience, she also testified about factors affecting disclosure of sexual abuse and why children do or do not disclose. Defense counsel objected to Lane's testimony for the following reasons: (1) "why [Victim] wasn't disclosing" the abuse was not a proper subject for expert testimony; (2) Lane was not qualified as an expert on the subject; and (3) Lane's testimony would improperly bolster Victim's testimony. The court overruled these objections and permitted Lane to testify.
At trial, Lane testified that she had been interviewing child victims of sexual abuse for 18 years and had thousands of interactions with those victims. In her experience, it was not uncommon for children to delay in disclosing abuse. The following factors influenced late disclosure: (1) the child's relationship to the perpetrator as the primary factor-the closer the abuser, the less likely the child would disclose; (2) the age of the child-the younger the child when the abuse began, the less likely the child would disclose; (3) the child's relationship with the non-offending caregiver-if the non-offending caregiver was a victim of domestic violence from the offending caregiver, if there had been past neglect of the child by the non-offending caregiver, or if the non-offending caregiver had issues with substance abuse, then it was less likely that a child would report the sexual abuse due to a perception of non-support; and (4) the extent of the child's isolation from close family or friends-the more isolated, the greater the likelihood of non-disclosure.
In addition, Lane testified about "sexual abuse accommodation syndrome." Lane gave this description of the syndrome: when the abuser is someone upon whom the child depends for support, the child feels trapped and uncertain about whom to tell, so the child accommodates the continued abuse. Lane concluded her testimony by acknowledging that she had never met Victim and had not participated in the investigation (i.e. Lane did not know Victim's name and did not read the police reports from her case).
On appeal, Defendant's point contends the trial court abused its discretion in admitting Lane's testimony "about late disclosure in victims of sexual abuse" and "sexual abuse accommodation syndrome" because such testimony improperly bolstered Victim's credibility.[2] We disagree.
"[E]xpert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence." State v. Haslett , 283 S.W.3d 769, 779 (Mo. App. 2009) (citation omitted). An expert witness should not be permitted to comment on the veracity of another witness, however, because such testimony invades the province of the jury. State v. Churchill , 98 S.W.3d 536, 538-39 (Mo. banc 2003). In Churchill , our Supreme Court explained the difference in admissibility of generalized versus particularized expert testimony in a sexual-abuse case involving a child:
General testimony describes a "generalization" of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse. Particularized testimony is that testimony concerning a specific victim's credibility *669 as to whether they have been abused. The trial court has broad discretion in admitting general testimony, but when particularized testimony is offered, it must be rejected because it usurps the decision-making function of the jury and, therefore, is inadmissible.
Id . at 539 (footnoted citation omitted); see State v. Baker , 422 S.W.3d 508, 513 (Mo. App. 2014). Here, Defendant concedes Lane's testimony was general in nature. Nevertheless, Defendant contends "[i]t does not matter that Lane did not say that [Victim] was definitely molested by [Defendant.]" According to Defendant, "such testimony is implicit when an expert testifies that a complaining witness suffers from [a] syndrome" by introducing "the 'misleading aura of certainty' that surrounds scientific evidence[.]"
A nearly identical argument based on similar facts was recently considered in State v. Walker , --- S.W.3d ----, ---- - ----, 2018 WL 1061769, at *5-6 (Mo. App. W.D. Feb. 27, 2018), reh'g and/or transfer denied (Mar. 22, 2018). In that case, defendant Walker challenged two statements from expert Estes that "most children do not disclose sexual abuse right away" and that "disclosure is a process." Id . at ----, 2018 WL 1061769 at *6. Walker argued the statements "were inadmissible because they implicitly bolstered [victims B.W.'s and N.G.'s] credibility by 'introducing the misleading aura of certainty that surrounds scientific evidence.' " Id . The western district of this Court rejected that argument because Estes' testimony was clearly generalized, and that testimony was responsive to Walker's defense of relying on victims' delay to demonstrate his innocence:
Estes's testimony about the behaviors that sexually abused children commonly exhibit was clearly generalized testimony. In neither of the two statements about which Walker complains did Estes explicitly or implicitly comment on B.W.'s or N.G.'s credibility or on the veracity of their reports that Walker had sexually abused them. Because Estes did not offer her opinion as to the victims' credibility, she never "lent a 'scientific cachet' on the central issue of credibility." Baker , 422 S.W.3d at 514-15 (citation omitted). Moreover, Walker's counsel relied heavily on the victims' delay in disclosing the sexual abuse to assert Walker's innocence. Estes's testimony, based on her extensive experience and studies performed in her field of expertise, was logically relevant to " 'assist[ ] the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror.' " Id. at 514 (citations omitted). Her testimony was more probative than prejudicial and, therefore, was also legally relevant. See id.
Walker , --- S.W.3d at ----, 2018 WL 1061769, at *6.
We reach the same conclusion here. Lane had never met Victim. There is no question that Lane's testimony was general in nature, and it neither explicitly nor implicitly commented on Victim's credibility. See id . ; see also State v. Thomas , 290 S.W.3d 129, 135 (Mo. App. 2009). Moreover, defense counsel in the case at bar similarly relied heavily on Victim's delay in disclosing her sexual abuse as supporting Defendant's innocence. Lane's testimony was particularly relevant in this case, which involved incidents spanning an eight-year period, to assist the jury in understanding the behavior of sexually abused children-a subject beyond the range of knowledge of the ordinary juror. See Walker , --- S.W.3d at ----, 2018 WL 1061769, at *6 ; see also State v. Tillitt , --- S.W.3d ----, ----, 2018 WL 325222, at *6 (Mo. App. W.D. Jan. 9, 2018), reh'g *670 and/or transfer denied (Feb. 27, 2018) (affirming admission of general testimony concerning delayed disclosure of child sexual-abuse victims, concluding that "[j]uries certainly assess witness credibility, but are unlikely to know, in the absence of expert testimony, that child sexual-abuse victims disclose differently than adults"). The trial court did not abuse its discretion in overruling Defendant's objection and admitting Lane's testimony. Point 1 is denied.
Point 2
Defendant's second point challenges the trial court's ruling allowing the late endorsement of Dr. Elias. Our review of this claim is also for abuse of discretion. See State v. Carl , 389 S.W.3d 276, 283 (Mo. App. 2013). The following facts are relevant to this point.
In January 2016, during a pre-trial conference, defense counsel and the prosecutor informed the court about a DNA test indicating Defendant was Son's father. There was a chain-of-custody issue with the test, and Defendant was expecting that a second DNA test would be done by the State. During that conference, the prosecutor stated that: (1) the chain-of-custody issue had been resolved; (2) the first DNA test was definitive; and (3) the State did not need a second DNA test. Trial was eventually set for early November 2016.
In late October 2016, the court sustained Defendant's motion to endorse witnesses, with no objection from the State. Defense counsel then requested a continuance because the prosecutor had disclosed two days earlier that a new DNA test had been done. The prosecutor responded by explaining that one of the people who had performed a part of the original test was in China. The prosecutor stated that Dr. Elias, "[t]he doctor who did the final analysis-the doctor who was endorsed to come to testify-she is still at the lab." The prosecutor had asked Dr. Elias to retest the same buccal swabs so that she could testify as to the results at trial with no chain-of-custody issue. Dr. Elias had complied and re-performed the same test on the same buccal swabs. The prosecutor argued that, since Dr. Elias was the same endorsed witness and expert, and had re-tested the same original buccal swabs from Victim, Son and Defendant, nothing had actually changed about the DNA test results. During the two years that the case had been pending, defense counsel had not attempted to obtain an expert who challenged the results of the first paternity test. The court overruled Defendant's motion for a continuance.
Just before Dr. Elias testified at trial, defense counsel objected on the ground that the prosecutor had "not endorsed her as a witness" since her name was not on the list. The prosecutor stated that it "was probably an error on my part" and that she had "provided everything" about this witness to defense counsel:
There is no surprise. I provided her CV. I provided him with the billing records associated with this. All of that has been produced to him before discovery. And, in fact, we have talked about Dr. Elias to a great extent before this in reference to the reports. Her phone numbers's [sic] been readily available. I have provided everything to [defense counsel]. So I'd just ask to move to endorse her today. There's been no surprise, and I've given him everything with regards to her testing, and he knew about her from-he's known about her from the beginning.
After further argument on the issue, the trial court granted the State's oral motion to endorse Dr. Elias. The judge stated that defense counsel knew "for two or three years what the test results were" and that the State "did a second one because of a *671 witness issue and the chain of custody in the testing of the first test." The court ruled that there was no surprise to Defendant that this witness was going to be called by the State to testify about the DNA results.
Dr. Elias testified that she was the co-director for PTC laboratories in Columbia, Missouri. She conducted a DNA analysis on three buccal swabs she received from the State. Dr. Elias developed three DNA profiles from the swabs: one for Defendant; one for Son; and one for Victim. Dr. Elias testified that the probability of Defendant being Son's father was 99.99999%.
Defendant's second point on appeal contends "Dr. Elias' testimony that [Defendant] was almost certainly the father of [Victim's] child was critical evidence against him" and, by allowing the State's late endorsement of Dr. Elias, the court's ruling "denied [Defendant] a fair trial and his due process right to present a defense," and was therefore an abuse of discretion.[3] We disagree.
"Regarding a late-endorsed witness, we will find an abuse of discretion only where the admission of testimony 'results in fundamental unfairness to the defendant.' " State v. Harris , 535 S.W.3d 769, 777 (Mo. App. 2017) (citation omitted); see Carl , 389 S.W.3d at 283. "Fundamental unfairness occurs when the state's failure to disclose results in defendant's 'genuine surprise' and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence." State v. Thompson , 985 S.W.2d 779, 785 (Mo. banc 1999) (citation omitted). In making this determination, we consider whether: "(1) the defendant waived the objection; (2) the State intended to surprise the defendant, or acted deceptively or in bad faith with the intention of causing disadvantage; (3) the defendant was, in fact, surprised and suffered disadvantage; and (4) the type of testimony presented might have been readily contemplated by the defendant." Harris , 535 S.W.3d at 777 ; see State v. Hutchison , 957 S.W.2d 757, 763 (Mo. banc 1997). The defendant has the burden of showing that the late endorsement resulted in fundamental unfairness. See State v. Robinson , 298 S.W.3d 119, 124-25 (Mo. App. 2009).
Here, Defendant failed to sustain his burden. The facts do not show harmful surprise, unanticipated testimony or bad faith on the part of the State. See, e.g. , State v. Renner , 675 S.W.2d 463, 465 (Mo. App. 1984). We find further support for our decision in Renner , where the eastern district of this Court similarly held there was no fundamental unfairness to the defendant when the trial court permitted late endorsement of a ballistics expert, Stubits, who performed his own tests. Id . The Court explained:
Stubits was simply a substitute witness for the state. The state had anticipated using Simpson as its ballistics expert and had given the defense a copy of Simpson's report. When Simpson became unavailable, Stubits, as his temporary successor, was substituted as a witness and performed his own, but similar, ballistics tests. Moreover, in a murder case involving a gun, it is natural to expect expert testimony on ballistics at trial. Hence, it is difficult to see how defendant could have been surprised by the nature of Stubits' testimony. Defendant could have been surprised only by the identity of the witness, not by the substance of the testimony. The identity *672 of the substituted witness itself could not work any prejudice against defendant.
Id . (internal citation omitted).
In the case at bar, Dr. Elias was not even a substitute witness. Instead, she was the same witness the prosecutor had intended to call throughout the duration of the case. Defendant does not explain how he was surprised by the State's late endorsement of Dr. Elias as a witness, nor does he describe how he would have handled Dr. Elias' testimony differently if he had known earlier that the prosecutor intended to call Dr. Elias as a witness. See Robinson , 298 S.W.3d at 124. There is no reasonable likelihood that an earlier endorsement of Dr. Elias would have affected the result of Defendant's trial in light of Defendant's knowledge of the DNA test results, the near-certainty that the prosecutor intended to call a witness to testify about those results, and the prosecutor's original endorsement of Dr. Elias as a witness. Accordingly, the trial court did not abuse its discretion in granting the prosecutor's oral motion to endorse Dr. Elias. Point 2 is denied.
The judgment of the trial court is affirmed.
DANIEL E. SCOTT, J.-CONCUR
WILLIAM W. FRANCIS, JR., J.-CONCUR

All statutory references are to RSMo Noncum. Supp. (2014).

On appeal, Defendant abandoned the objections that Lane was not an expert and that her testimony involved a subject on which expert testimony was not needed. The only objection preserved for appeal is improper bolstering.

This claim of error is preserved because it was included in Defendant's motion for new trial.